1

```
1    ------------------------------------x.
2    THE PEOPLE OF THE STATE OF NEW YORK   :
3                          PLAINTIFF,     :
4           against                  :      7974/10
5    SHANE RHOOMS,                        :
6                          DEFENDANT,    :
     ------------------------------------x
7                   SEPTEMBER 8, 2010
8
9
10
11
12
13
14
15
16
17   CHARLES J. HYNES, ESQ., DISTRICT ATTORNEY, KINGS COUNTY
     LEWIS LIEBERMAN, ESQ., Assistant District Attorney
18                   ANDREA RABINOWITZ
19             Reporter/Stenographer (D. A.)
20   A.R.
21
22
23
24
25
```

CONFIDENTIAL          NYC 4448

5

DETECTIVE DEVON FREED

1

2

3     Q.    Good morning Detective.

4        Could you state your name, shield and command for

5 the jurors please?

6        A.    Detective Freed, shield 2577, 67 Precinct,

7 Detective Squad.

8     Q.    How long have you been with the New York City

9 Police Department?

10        A.    18 years.

11     Q.    How long as a Detective?

12        A.    Over 13.

13     Q.    What grade Detective are you?

14        A.    First grade.

15     Q.    What is the top grade?

16        A.    First grade.

17     Q.    Okay.

18        I want to draw your attention to this past Sunday

19 night into early morning, actually morning of

20 September 6th, were you working that evening?

21        A.    I was.

22     Q.    And did there come a time you became involved in

23 an investigation of a shooting in the 67th Precinct?

24        A.    Yes, it was a MOS, member of service involved

25 in a shooting.

CONFIDENTIAL       NYC 4449

1    Q.   Anyone else when you say members of service

2    involved?

3         A.   Actually three members of the service

4    involved in the shooting.

5    Q.   Where did that take place?

6         A.   In the rear of 222 Lenox Road.

7    Q.   What county is that in?

8         A.   Kings County.

9    Q.   How when you said there was three MOS, three

10   Police Officers, did you learn what -- withdrawn.

11        What's a case Detective?

12        A.   Case Detective is the lead Detective

13   especially in a large investigation.  There could be up

14   to 100 Detectives working on a case.  Case Detective is

15   the person in charge of the case and directed that

16   case.

17   Q.   Who became the case Detective in the incident you

18   started to share?

19        A.   I did.

20   Q.   Okay.

21        And did you speak to other officers pursuant to

22   this investigation?

23        A.   Yes, I did.

24   Q.   And other than the three Police Officers involved,

25   did you learn whether someone else was involved in the

CONFIDENTIAL          NYC 4450

1    shooting?

2        A.    There was a suspect that they were attempting

3    to apprehend.

4    Q.   Okay.

5        What did you learn that suspect had done at the

6    time of the incident?

7        A.    He had shot the police with a handgun.

8    Q.   Do you know whether anybody was hit that evening?

9        A.    Nobody was hit that evening.

10   Q.   Okay.

11       And when you say suspect, did you eventually

12   develop a particular suspect in this case?

13       A.    Yes.

14   Q.   What's the name of that individual?

15       A.    Shane Rhooms.

16   Q.   Did there come a time when Rhooms was taken into

17   custody?

18       A.    Yes, he did.

19   Q.   When was that?

20       A.    Believe that was 6 O'clock p.m. on the 7th, I

21   have to check my notes, I believe that's it.

22   Q.   In other words this -- in other words a day later?

23       A.    Correct.

24   Q.   How was he taken into custody?

25       A.    He actually surrendered into the

1    67th Precinct.

2    Q.    Did the police make any efforts to apprehend him

3    prior to surrendering?

4         A.    Numerous times.

5    Q.    Once he surrendered himself, pursuant to the

6    investigation, did you take any other police actions?

7         A.    Yes.

8    Q.    What was that?

9         A.    I conducted three line-ups.

10   Q.    When were those line-ups conducted?

11        A.    Conducted 12:30 a.m. on the 7th I believe.

12   Q.    Today is Wednesday the 8th, they we conducted

13   12:30 a.m. early Tuesday morning?

14        A.    Correct, Monday was Labor Day, Monday at

15   12:30.

16        Let me take a look.

17   Q.    Check your notes.

18        A.    It was Tuesday morning, Tuesday morning

19   12:30 a.m.

20   Q.    On the 7th, is that correct?

21        A.    I believe so, I want to double check.

22        Right would be 12:30 a.m. on the 7th, September

23   7th.

24   Q.    And how many line-ups were conducted?

25        A.    Three.

CONFIDENTIAL          NYC 4452

9

1    Q.   So who viewed the line-ups?

2         A.   Three Officers involved, Lieutenant Ortlieb,

3    Lieutenant Henderson and Sergeant Seminara.

4    Q.   How many people were in the line-up?

5         A.   Six person in the line-up.

6    Q.   And was Rhooms shown in the line-up?

7         A.   Subject Shane Rhooms was in the line-up and

8    sat in position number three, which he chose to sit in.

9    Q.   And what is pedigree information sir?

10        A.   Pedigree is information basically information

11   about a persons date of birth, name, age and physical

12   description.

13   Q.   Did there come a time when you learned Shane

14   Rhooms date of birth?

15        A.   Yes, there was.

16   Q.   What was that sir?

17        A.   Again I have to take a quick look at my paper

18   work.

19        Date of birth was, is April 22, 1988.

20   Q.   No further questions.

21        You can step out sir.

22

23        (Whereupon, the Witness exited the Grand Jury

24   room.)

25

CONFIDENTIAL        NYC 4453

1

```
 1      -------------------------------------x
        THE PEOPLE OF THE STATE OF NEW YORK  :
 2
 3                              PLAINTIFF,    :
 4
            against                    :   7974 / 2010
 5
 6
        SHANE RHOOMS                         :
 7
 8
                        DEFENDANT,    :
 9      -------------------------------------x
10
                    SEPTEMBER 10, 2010
11
12
13
14
15
        CHARLES J. HYNES, ESQ., DISTRICT ATTORNEY, KINGS COUNTY
16      LEWIS LIEBERMAN, ESQ., Assistant District Attorney
17
18
                        JEANENE MONIOT
19                  REPORTER/STENOGRAPHER (D.A.)
20
        DV.
21
22
23
24
25
```

1                    SERGEANT JOSEPH SEMINARA

2

3    Q.   Good morning, sir.

4         A.   Good morning.

5    Q.   Could you state your name, shield and command for

6    the jurors, please?

7         A.   Sergeant Seminara, shield number 2815, 75th

8    Precinct.

9    Q.   How long have you been with the New York City

10   Police Department?

11        A.   A little over six years.

12   Q.   How long have you been with the 75?

13        A.   A little over a year.

14   Q.   Where were you prior to the 75?

15        A.   The 67 Precinct in East Flatbush.

16   Q.   Is that here in Brooklyn?

17        A.   Yes.

18   Q.   When did you become a sergeant, sir?

19        A.   August of 2009, 1st year.

20   Q.   About when you moved over to the 75 in other

21   words?

22        A.   Yes.

23   Q.   I want to draw your attention to September the

24   8th, this past Sunday night into Monday morning at 0030

25   hours at 12:30 in the morning.

CONFIDENTIAL          NYC 4455

1         A.   I am sorry.  I think that might have been the

2    6th.

3    Q.   That's a typo, it's my fault.  I am sorry.

4    September the 6th.  Thank you.  September the 6th,

5    early in the morning of Monday morning, this past

6    Monday morning, were you working at that time?

7         A.   Yes, I was.

8    Q.   What precinct were you working in?

9         A.   I was working in the confines of the 67

10   Precinct.

11   Q.   Why the 67 as opposed to your present home command

12   the 75?

13        A.   I was brought back there to assist in -- it's

14   called a detail for the pre Labor Day festivities.

15   Q.   You're talking about the Caribbean Day Parade?

16        A.   Yes.

17   Q.   What was your tour that evening?

18        A.   My tour was scheduled to be 3:00 p.m. by

19   1157, but with overtime expected, I wasn't going home

20   at 1157.

21   Q.   Were you in uniform or plainclothes?

22        A.   I was in uniform that night.

23   Q.   On foot or in a car?

24        A.   A car.

25   Q.   Marked police car or unmarked?

CONFIDENTIAL          NYC 4456

1      A.   It was an unmarked car.

2   Q.   Were you alone or other officers?

3      A.   Other officers.

4   Q.   Who where they, sir?

5      A.   Police Officer Insogna, I-N-S-O-G-N-A.

6   Q.   If you could say the other officers, tell the

7  jurors where they were sitting?

8      A.   Police Officer Insogna driving, Lieutenant

9  Henderson, common spelling, was in the front passenger

10  seat, I was directly behind Lieutenant Henderson, and

11  Lieutenant Ortlieb, O-R-T-L-I-E-B, was in the back seat

12  behind the driver.

13   Q.   So, at about 12:30 in the morning, where were you?

14      A.   I was in the vicinity of 222 Lenox Road.

15   Q.   What direction does Lenox Road go?

16      A.   It runs east and west.

17   Q.   Which direction were you going?

18      A.   We were traveling eastbound.

19   Q.   What, if anything, did you see or smell or hear or

20  anything at that time?

21      A.   We smelt a strong order of marijuana.

22   Q.   How fast was your car going?

23      A.   Very, very slow.

24   Q.   Windows open or closed?

25      A.   Windows were open.

CONFIDENTIAL      NYC 4457

8

1   Q.   Were you able to see where the smell of marijuana

2   was coming from?

3        A.   Yes.

4   Q.   Describe for the jury what you saw in the area

5   where you smelled the marijuana.

6        A.   Right to the right of my vehicle, I saw four

7   individuals, there was a cloud of smoke around them and

8   as we got closer to them, the smell of marijuana got

9   stronger.

10  Q.   If you were the passenger, you said off to your

11  right, in other words, were you closer to those

12  individuals or would the driver's side be closer?

13       A.   No, myself and Lieutenant Henderson would

14  have been closer to them than the driver and the

15  lieutenant behind the driver.

16  Q.   What direction were you headed on Lenox?

17       A.   I was headed east, they were immediately to

18  my right.

19  Q.   East or west?

20       A.   They would have been on the south side of

21  Lenox.  If I am going eastbound, they're right to my

22  right, so the passenger side of the car.

23  Q.   Okay.  So, once you saw these four people, what,

24  if anything, did you and your follow officers do?

25       A.   We stopped the vehicle and at that point one

CONFIDENTIAL          NYC 4458

1    of the individuals kind of grabbed his waist and slid

2    behind one of the other people that were standing there

3    with him.

4        MR. LIEBERMAN: Let the record indicate the officer

5    grabbed at his waist.

6    Q.   If you can stand and show the jury the motion you

7    were doing while you were standing up.

8        A.   When the vehicle stopped one of the

9    individuals grabbed his waist, made an adjustment and

10   stepped behind, got single file behind one of the other

11   guys standing there.

12       MR. LIEBERMAN: Let the record reflect right front

13   over his waist and with his left-hand just underneath

14   that and moved it a little bit and stepped a little

15   backwards to his left.

16   Q.   He moved behind another individual?

17       A.   Correct.

18   Q.   And what did you do and the other officers do?

19       A.   We exited the vehicle.

20   Q.   What happened next?

21       A.   As soon as we exited the vehicle, very

22   shortly thereafter the individual that I previously

23   described stepping behind the other person took off

24   running.

25   Q.   And then what happened?

CONFIDENTIAL          NYC 4459

1         A.    We pursued him.   My partner was shouting

2    verbal commands for him to stop.   A little while after

3    the foot chase started, I saw him remove a black

4    firearm from his waistband and put his arm back and

5    fired two shots at us.

6         MR. LIEBERMAN: Let the record reflect the witness

7    turned by his right side and pointed his arm

8    perpendicular to the ground, turning it, facing behind

9    him -- excuse me, parallel to the ground.

10   Q.    About how far away were you from him when he

11   turned and fired?

12        A.    No more then ten yards.

13   Q.    Were you in front of or in back of -- who were the

14   first officers who were chasing him?

15        A.    When the pursuit actual started, Lieutenant

16   Henderson was actually first.   I am a little younger

17   than him, I moved over to the right with the intention

18   of eventually passing him.   So, when the individual

19   fired at us, I was still behind Lieutenant Henderson

20   but off to his right a little bit.

21   Q.    At the time he fired, did you have your weapon

22   out?

23        A.    Not before he started shooting.

24   Q.    Did you then take it out?

25        A.    Then I took it out.

1    Q.    After he let go of those two rounds, what did he

2    do then?

3          A.    He continued to run and then made a left at

4    the -- where the driveway meets sort of a courtyard,

5    made a quick left.

6    Q.    What did he do then?

7          A.    He ran down a ramp which makes a right angle

8    with another ramp.  By the time we rounded the corner,

9    because the shots obviously made me stutter step a

10   little bit, by the time I got around the corner, he was

11   down the second ramp.  And when Lieutenant Henderson

12   and I rounded the corner, he began firing at us again.

13   At that point, I got down on one knee and returned

14   fire.

15   Q.    You did return fire?

16         A.    Yes.

17   Q.    And then what happened?

18         A.    He continued shooting as he backed into a

19   doorway which was at the bottom of that second ramp,

20   went inside the doorway.  Then there was a pause, so we

21   began advancing and then unexpectedly his arm swung out

22   the door jamb and started shooting again.

23   Q.    Did anybody get hit that you know of?

24         A.    No.

25   Q.    Are you aware if had you hit him or anybody else,

1     any of your other officers?

2         A.   No, Thank God.

3     Q.   Was he apprehended at that time?

4         A.   At that time, no.

5     Q.   When you were running after him, did anybody

6     identify themselves as police or ordered him to stop?

7         A.   Yes, Lieutenant Henderson being the lead

8     person in the pursuit and therefore closer to him was

9     shouting verbal commands.

10    Q.   I want to draw your attention, sir, to the early

11    -- the next morning, the 7th, early Tuesday morning,

12    did you have an opportunity to see that individual who

13    had fired at you?

14        A.   Yes.

15    Q.   Did you learn his name?

16        A.   Yes.

17    Q.   What was his name?

18        A.   Shane Rhooms.

19    Q.   What were the circumstances under which you saw

20    him?

21        A.   I was brought in to view a lineup.

22    Q.   How many people were in the lineup?

23        A.   Six.

24    Q.   Did you recognize Shane Rhooms in that lineup?

25        A.   Yes.

13

1    Q.    What number was he?

2          A.    He was in three.

3    Q.    Nothing further.  You have can step out, sir.

4

5                      (WITNESS EXCUSED)

LIEUTENANT ROBERT HENDERSON

Q.   Good morning, sir.

     A.   Good morning.

Q.   Can you state your name, shield and command for the jurors, please?

     A.   My name is Lieutenant Robert Henderson of the 69 Precinct of Brooklyn, New York.

Q.   How long have you been a New York City Police Officer?

     A.   Approximately 13 and a half years.

Q.   How long have you been a lieutenant?

     A.   One and a half years.

Q.   Where did you serve before you were assigned to the 69, sir?

     A.   I worked in the 67 Precinct and the 77 Precinct.

Q.   Were you working last Sunday night into Monday, September 5th into September 6th?

     A.   Yes.

Q.   What precinct were you working in?

     A.   I was assigned to the 67 Precinct.

Q.   Did you work alone or with anybody else?

     A.   I was working with three partners.

Q.   Who was that?

CONFIDENTIAL          NYC 4464

1          A.    Police Officer Insogna, I-N-S-O-G-N-A,

2     Lieutenant Ortlieb, O-R-T-L-I-E-B, and Sergeant

3     Seminara, S-E-M-I-N-A-R-A.

4     Q.    What area were you working in?

5          A.    I was working in the 67 precinct.

6     Q.    In Brooklyn?

7          A.    In Brooklyn.

8     Q.    Were you on foot or in a vehicle?

9          A.    I was in a vehicle.

10    Q.    Were you in plainclothes or uniform?

11         A.    Uniform.

12    Q.    Where were you at approximately 12:30 in the

13    morning, early in the morning on September the 6th,

14    early Monday morning?

15         A.    I was in the vehicle in front of 222 Lenox

16    Road.

17    Q.    What direction was that vehicle traveling?

18         A.    Facing eastbound.

19    Q.    Where were you seated in the vehicle?

20         A.    I was the front passenger.

21    Q.    If you're facing eastbound, 222 is on what side of

22    the street?

23         A.    It's on the right side if you're facing

24    eastbound.

25    Q.    In other words, closer to you as opposed to the

1    driver?

2         A.    Correct.

3    Q.    Is that the south side of the street?

4         A.    That would be the south side of the street,

5    yes.

6    Q.    What, if anything, did you observe or see anything

7    at that time?

8         A.    As we were patrolling down the street, we're

9    going down, as we got in front of 222 Lenox, I noticed

10   an unmistakable smell of marijuana being smelled.   I

11   observed four individual on the side of 222 Lenox in

12   front of the alleyway.

13   Q.    Were your windows up or down?

14        A.    They were down.

15   Q.    What did you do after you smelled the marijuana

16   and saw those people?

17        A.    I told Officer Insogna to stop the vehicle.

18   Q.    Were you in charge of this unit of four officers?

19        A.    There was another lieutenant working, we were

20   coworkers of the unit.

21   Q.    And the car stopped?

22        A.    Yes.

23   Q.    And then what happened?

24        A.    At that point, I exited the vehicle and I

25   started to approach the four individuals who were

CONFIDENTIAL        NYC 4466

1    smoking the marijuana and said --

2    Q.    Please, wait one second. Were you in uniform?

3          A.    Yes.

4    Q.    What did they do?

5          A.    At that time, one of the individuals started

6    to adjust something on his waist and move behind

7    another one of the individuals in the group.

8    Q.    Could you see what it was in his waist at that

9    time?

10         A.    No.

11   Q.    What happened next?

12         A.    At that point I told him, Please, stop.  And

13   he started to he turn around and ran down the alleyway.

14   Q.    Without -- unless the jury later requests it,

15   without a step by step description --

16         MR. LIEBERMAN: Again, Jury, unless you request it

17   later.

18   Q.    ·-- tell the jury what the individual did as he ran

19   down the alleyway.

20         A.    He started to fire a handgun at us.

21   Q.    Did you return fire?

22         A.    Yes.

23   Q.    How many times did he fire the handgun at you?

24   How many junctures did he fire the handgun?

25         A.    At three separate junctions.

CONFIDENTIAL        NYC 4467

18

1    Q.    Where was the last one -- where was he at the last

2    one?

3          A.    He was inside of the building.  He had run

4    into a courtyard, he entered through a door that lead

5    from a courtyard into the building, the back rear of

6    the building.

7    Q.    Could you actually see his whole body when was in

8    that building?

9          A.    No.

10   Q.    Tell the jury what you saw, please.

11         A.    At that point, I observed his arm extend

12   outside of the door and fire shots at us.

13         MR. LIEBERMAN: Let the record reflect the witness

14   put his arm out about shoulder high parallel to the

15   floor.

16   Q.    You did return fire?

17         A.    Yes.

18   Q.    Was anyone hit?

19         A.    No.

20   Q.    Was he apprehended at that time?

21         A.    At that time, no.

22   Q.    Was he later apprehended?

23         A.    Yes.

24   Q.    I want to draw your attention, sir, to early in

25   the morning of September the 7th the next day, early

CONFIDENTIAL          NYC 4468

1    Tuesday morning, where were you at that time early in

2    the morning?

3         A.   I was at the 71 Precinct.

4    Q.   Why were you there?

5         A.   To view a lineup.

6    Q.   Did you view one?

7         A.   Yes.

8    Q.   How many people in the lineup?

9         A.   Six.

10   Q.   Do you recognize anyone?

11        A.   Yes.

12   Q.   Who was that?

13        A.   I observed the individual that was firing the

14   gun at us earlier that day.

15   Q.   Do you remember what position he was in the

16   lineup?

17        A.   Yes.

18   Q.   What number?

19        A.   Three.

20   Q.   Did you learn his name?

21        A.   Yes.

22   Q.   What is that?

23        A.   Shane Rhooms.

24   Q.   Thank you for your testimony, sir.  You may step

25   out.

CONFIDENTIAL         NYC 4469

1           A.     You're welcome.

2

3                           (WITNESS EXCUSED)

21

1              LIEUTENANT ROBERT HENDERSON, RECALLED

2

3      Q.    Lieutenant, how were you able to recognize Rhooms?

4            A.    I recognized his face.

5      Q.    About how long did it take you to recognize him

6      once you saw him in the lineup?

7            A.    Immediately.

8      Q.    Thank you.

9

10                        (WITNESS EXCUSED)

CONFIDENTIAL        NYC 4471

1              LIEUTENANT ROBERT HENDERSON, RECALLED

2

3       Q.    Sorry.  Lieutenant, when you were chasing Rhooms,

4   what other police officers were with you?

5           A.    Sergeant Seminara, Lieutenant Ortlieb and

6   Officer Insogna.

7       Q.    How far was Ortlibe -- withdrawn.

8           At the beginning of the chase, who was in the

9   front?

10          A.    Myself.

11      Q.    And by the time the defendant was shooting, the

12  first, second and third time, about how close was

13  Lieutenant Ortlieb to you?

14          A.    He was probably about ten yards away from me.

15      Q.    Was he in the same direction, in other words,

16  behind you where the defendant was shooting?

17          A.    It depends on which time.  There were three

18  separate incidents.  When he was firing initially, he

19  was.  And then actually the shots were closer to his

20  direction later on.

21      Q.    At one point the defendant was shooting in the

22  direction of Lieutenant Ortlieb?

23          A.    Yes.

24      Q.    And was Ortlieb in uniform?

25          A.    Yes.

CONFIDENTIAL          NYC 4472

24

1    Q.    Thank you, sir.

2

3                      (WITNESS EXCUSED)

CONFIDENTIAL            NYC 4473

26

```
 1              LIEUTENANT ROBERT HENDERSON, RECALLED

 2

 3     Q.    Did you apprehend Rhooms that night after he went

 4    into that building?

 5          A.   No.

 6     Q.    Did you recover a gun that night?

 7          A.   No.

 8     Q.    Thank you.

 9

10              (WITNESS EXCUSED)
```

CONFIDENTIAL          NYC 4474