UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------------------------------X

SHANE RHOOMS,

                                                    Plaintiff,

            -against-

CITY OF NEW YORK, ROBERT ORTLIEB, Individually,
ROBERT HENDERSON, Individually, JOSEPH SEMINARA,
Individually, DEVON FREED, Individually, and JOHN DOE 1,
Individually, (the name John Doe being fictitious, as the true
name is presently unknown),

                                                    Defendants.

--------------------------------------------------------------------------------X

**PLAINTIFF'S
RESPONSE TO
DEFENDANTS'
LOCAL RULE 56.1
STATEMENT
AND COUNTER
STATEMENT OF
DISPUTED
MATERIAL
FACTS FOR
TRIAL**

11 CV 5910
(PKC) (RER)

        Pursuant to Rule 56.1(b) of the Local Civil Rules, plaintiff respectfully submits this

Response to Defendants' Local Rule 56.1 Statement.

        1.      Not disputed.

        2.      Not disputed.

        3.      Move to strike as immaterial to the motion and thus not a proper subject of a Rule

56.1 statement insofar as purported violence during past Labor Day celebrations is irrelevant to

the motion.   Disputed that additional officers were brought in due to violence, as NYPD

Lieutenant Frank Sciortino, who is the squad commander of the 67 detective squad, testified that

additional details are assigned due to increased crowds.   *See* Klein Decl. Ex. 1, Sciortino Dep.

6:13-18, 31:6-13.

        4.      Not disputed.

        5.      Not disputed.

6. Not disputed that defendants Seminara, Henderson, and Ortlieb were on patrol and engaged in a foot pursuit at approximately 12:40 a.m., and that during the pursuit, defendants Seminara, Henderson, and Ortlieb discharged their weapons. Disputed that the individual who they were pursuing fired several shots at the officers insofar as this is not supported by the ballistics evidence. *See* Pl.'s 56.1 Counter Statement (hereinafter "PCS") ¶¶ 37-39.

7. Not disputed.

8. Plaintiff lacks sufficient information to dispute or deny whether the individual was actually observed reaching for his waistband, but disputes any inference that this purported action signaled that the individual was carrying a weapon insofar as it is disputed that the individual who defendants pursued fired several shots at them. *See* PCS ¶¶ 37-39.

9. Not disputed that the individual ran down the alleyway, but again dispute any inferences regarding the claim that the individual reached for his waistband before running. *See* Response to ¶ 8, *supra*

10. Not disputed that Ortlieb, Henderson, and Seminara chased an individual down the alleyway and that Ortlieb, Henderson, and Seminara fired at the individual. Disputed that the individual who they were pursuing fired multiple shots at Ortlieb, Henderson, and Seminara. *See* PCS ¶ 37.

11. Not disputed.

12. Not disputed.

13. Not disputed.

14. Not disputed.

15. Not disputed.

16.     Disputed that defendants Seminara, Henderson, and Ortlieb were purely victims or complainants insofar as defendants Seminara, Henderson, and Ortlieb themselves admit to being part of the case, engaging in police work related to the incident such as: directing officers to question certain civilians, walking superiors through the crime scene, canvassing the area of the shooting, and/or having access to information through defendant Freed, through their presence at the precinct where the investigation was occurring, and through NYPD databases, that a mere victim or complainant would not have access to. *See e.g.*, Klein Decl. Ex. 2, Henderson Dep. 72:3-21; 74:2-75:19; 158:1-161:2; 165:24-166:3. Ex. 3, Ortlieb Dep. 103:6-9; 159:19-160:24; 162:12-163:5; 167:11-22; Ex. 4, Seminara Dep. 73:2-17; 190:10-15; 211:20-214:19; 217:14-21; 228:5-17.

17.     Disputed. *See* Response to ¶ 16, *supra*.

18.     Disputed that Ortlieb, Henderson, and Seminara provided investigators with an age of the alleged perpetrator insofar as defendants admit that the best description they had at the time of the shooting was male, black, dark clothing. *See* PCS ¶¶ 40-42.

19.     Disputed that Ortlieb, Henderson, and Seminara could describe the alleged perpetrator's hair, piercings, or tattoos at the time of the shooting insofar as defendants admit that the best description they had at the time of the shooting was male, black, dark clothing. *See* PCS ¶¶ 40-42.

20.     Move to strike as immaterial because ADA Lieberman's after the fact self-serving opinion testimony is not properly the subject of a Rule 56.1 Statement of undisputed facts.

21.     Not disputed.

22.     Move to strike any purported statements attributed to Maria Carson because the alleged statements cannot be presented in admissible form at trial because they are hearsay and

are not admissible for another purpose insofar as her statements do not link Shane Rhooms to the shooting.  *See* Fed. R. Civ. P. 56(c)(2).

23.     Move to strike any purported statements attributed to Hopeton Clark because the alleged statements cannot be presented in admissible form at trial because they are hearsay and they are not relevant for any other purpose insofar as they are also irrelevant to the establishment of probable cause, and further dispute any inference that Hopeton Clark implicated Shane Rhooms as being involved in the shooting insofar as Detective Barrett, who interviewed Clark, admits that there was nothing of investigatory value gleaned from his interview of Clark, and defendant Freed admits that Clark never implicated Rhooms in the shooting.  *See* Fed. R. Civ. P. 56(c)(2).  *See* Klein Decl. Ex. 5, Barrett Dep. 58:11-61:12; Ex. 6, Freed Dep. 231:15-233:13.

24.     Move to strike any purported statements attributed to Jason Brown because the alleged statements cannot be presented in admissible form at trial because they are hearsay and they are not relevant for any other purpose insofar as they are irrelevant to the establishment of probable cause, and further dispute any inference that Jason Brown implicated Shane Rhooms as being involved in the shooting insofar as defendant Freed admits that Brown never implicated Rhooms in the shooting. *See* Fed. R. Civ. P. 56(c)(2); Klein Decl. Ex. 6, Freed 151:7-154:17; 257:4-14.

25.     Not disputed.

26.     Move to strike as immaterial insofar as defendants have presented no evidence that Jason Brown or "Courtney" were involved in the shooting, or that they implicated plaintiff in the shooting.  Plaintiff's past relationship with Brown and Courtney is thus immaterial to the motion and thus not a proper subject of a Local Rule 56.1 Statement.  *See* Klein Decl. Ex. 6, Freed 151:7-154:17; 257:4-14.

27.     Move to strike as immaterial insofar as defendants have presented no evidence that Jason Brown or "Courtney" were involved in the shooting, or that they implicated plaintiff in the shooting.  Plaintiff's past relationship with Brown and Courtney is thus immaterial to the motion and thus not a proper subject of a Local Rule 56.1 Statement.  *Id.* at 151:7-154:17; 257:4-14.

28.     Plaintiff lacks sufficient information to dispute or deny whether any other Shane's were revealed in the computer checks insofar as no discovery was ever produced which confirmed which checks were done and what the results were.  Further, dispute any inference that there were no other Shane's in the area insofar as plaintiff testified that he was aware of another Shane who in fact lived in 222 Lenox Road.  *See* Ex. 7, Rhooms Dep. 147:13-17.

29.     Move to strike the statement attributed to Jason Brown because the alleged statement cannot be presented in admissible form at trial because it is hearsay and it is not admissible for another purpose insofar as this statement is irrelevant to the motion and to the establishment of probable cause to arrest plaintiff because all Brown stated was that he was with Shane Rhooms earlier in the day, not at the time of the shooting.  *See* Fed. R. Civ. P. 56(c)(2); Klein Decl. Ex. 6, Freed 151:7-154:17; 257:4-14.

30.     Not disputed.

31.     Not disputed.

32.     Not disputed.

33.     Not disputed.

34.     Not disputed.

35.     Not disputed.

36.     Not disputed.

37.    Not disputed.

38.    Not disputed.

39.    Not disputed

40.    Not disputed.

41.    Not disputed.

42.    Not disputed.

43.    Not disputed.

44.    Not disputed.

45.    Not disputed.

46.    Not disputed that plaintiff had just left Bigs' house when he heard from his mother that the police were looking for him, but dispute any inference that plaintiff testified he went back to Bigs' house to figure out what was going with on as to himself, insofar as he testified that he went to Bigs' house to figure out what was going on around "here," indicating the area of 222 Lenox Road.  *See* Klein Decl. Ex. 7, Rhooms Dep. 99:10-24.

47.    Not disputed.

48.    Not disputed.

49.    Not disputed that defendant Robert Ortlieb provided information which led to the drafting of a criminal court complaint, but dispute that defendant Ortlieb was a mere complaining victim in this case.  *See* Response to ¶ 16, *supra.*

50.    Not disputed.

51.    Not disputed.

52.    Not disputed.

53.    Not disputed.

54.     Not disputed.

55.     Not disputed.

56.     Not disputed.

57.     Not disputed.

58.     Not disputed.

59.     Move to strike insofar as ADA Lieberman's opinion regarding the importance of the "CI" (confidential informant) is based on facts in dispute insofar as ADA Lieberman testified that he was told by Freed that Perez was a "CI," that he believed he may not have known that Perez was an eyewitness to the shooting when he first learned about him, and Lieberman claims Freed never gave him the photo of plaintiff which Perez signed identifying plaintiff as being involved in the shooting, whereas Freed claims he would never have told ADA Lieberman that Perez was a "CI" and further claims that he gave ADA Lieberman a copy the photo signed by Perez. *Id.* at Ex. 8, Lieberman Dep. 31:5-14; 48:24-49:4; 53:15-23; 56:24-57:21; 83:12-84:15; 99:23-22; Ex. 6, Freed Dep. 275:6-276:22.

60.     Move to strike as immaterial because ADA Lieberman's after the fact opinion testimony is not properly the subject of a Rule 56.1 Statement of undisputed material facts and because it is undisputed that during the pendency of the prosecution ADA Lieberman did not know that Trevor Perez had been coerced at that time. *See id.* at Ex. 8, Lieberman Dep. 101:10-18.

61.     Not disputed that ADA Lieberman did not have in his file and was never given any documents relating to witness Trevor Perez, but dispute ADA Lieberman's claim that the case was not near the stage where ADA Lieberman would have received these documents insofar as Freed and Freed's supervisor Sciortino further testified that the signed statement was given to

7

ADA Lieberman, and Sciortino testified that it would be given right away.  *See id.* at Ex. 6,

Freed Dep. 275:6-276:22; Ex. 1, Sciortino Dep. 84:7-20; 127:23-128:14.

62.      Move to strike as immaterial because it is undisputed that during the pendency of

the prosecution ADA Lieberman did not know that Trevor Perez was coerced, and his after the

fact opinion testimony is not properly the subject of a Rule 56.1 Statement of undisputed facts.

*See id.* at Ex. 8, Lieberman Dep. 101:10-18.

<u>**COUNTER STATEMENT OF DISPUTED MATERIAL FACTS FOR TRIAL**</u>

1.      On September 5, 2010, a few hours before midnight, plaintiff travelled by public

transportation from Brooklyn, to his cousin Alhue Gayle's home in Queens, and, from there,

traveled by car with his cousin and some friends to Webster Hall, a Manhattan night club,

arriving at Webster Hall sometime around 12:00 a.m. on September 6, 2010.  *See id.* at Ex. 7,

Rhooms Dep. 82:3-88:4.

2.      Plaintiff was continuously present in Webster Hall from approximately 12:00 a.m.

on September 6, 2010 to approximately 5:00 a.m., on September 6, 2010.  *Id.* at 89:6-90:6.

3.      At approximately 12:40 a.m., while plaintiff was at Webster Hall in Manhattan,

defendants NYPD Sergeant Joseph Seminara, and Lieutenants Robert Henderson and Robert

Ortlieb claim they were involved in a shooting, in the vicinity of 222 Lenox Road, in Brooklyn.

*See* PCS ¶ 1-2; Klein Decl. Ex. 9, Criminal Court Complaint.

4.      With respect to the events leading up to the purported shooting on September 6,

2010, Henderson, Ortlieb, and Seminara were patrolling in a police vehicle operated by Officer

Daniel Insogna.  *See* Klein Decl. Ex. 3, Ortlieb Dep. 81:23-82:20.

5.      Defendant Henderson testified that he was seated in the front passenger side of

the police vehicle when his attention was drawn by the smell of marijuana to a group of three

males and one woman standing near an alleyway by 222 Lenox Road. *See id.* at Ex. 2, Henderson Dep. 96:5-11; 115:5-120:18. The individuals were facing away from the approaching car. *Id.* at 124:1-5.

6. As they pulled up, Henderson observed one of the individuals step behind the group, shielding his face from view. *Id.* at 122:5-14.

7. Initially, Henderson got only a quick look at the individual's face, which was not conclusive, and which lasted only a few seconds. *Id.* at 140:14-141:4, 191:3-193:12.

8. Henderson began to exit the vehicle and identified himself as a police officer, at which point the individual who had stepped behind the group ran down a dark alleyway, with his back towards the officers. *Id.* at 124:15-125:19.

9. At some point in the dark alleyway, Henderson claims he also saw the right side of the individual's face for a few seconds, as the individual fired his gun at him, but his focus was more on the gun. *Id.* at 152:10-153:21; 191:3-193:12.

10. The individual was wearing dark blue or black jeans, and a charcoal gray shirt. *Id.* at 137:3-23.

11. Defendant Seminara testified that he was seated in the rear passenger side seat of the vehicle as they approached 222 Lenox Road. *See id.* at Ex. 4, Seminara Dep. 144:9-20.

12. As they approached 222 Lenox Road, Seminara saw a group of individuals standing in front of 222 Lenox Road and smelled the odor of marijuana. *Id.* at 145:11-22.

13. Seminara's focus was initially on the group, but then he saw one of the individuals grab his waistband and step behind the others in his group, which drew his attention to that individual. *Id.* at 145:11-22, 152:11-25.

14.     Seminara claimed that the individual then stepped back out from behind the group, at which point Henderson opened his door, and the individual ran down the alleyway. *Id.* at 148:17-149:5.

15.     From when Seminara focused on the individual as opposed to the group as a whole, he had about five seconds to observe the individuals face before he ran. *Id.* at 167:10-16.

16.     When Seminara observed the individual for about five seconds, it was dark outside, with street lights, but Seminara could not say how close the lights were to the group. *Id.* at 167:17-168:10.

17.     The individual who ran was wearing dark colored clothing. *Id.* at 149:23-25.

18.     Defendant Ortlieb testified that he was seated in the rear driver side seat of the police vehicle, behind Officer Insogna, when Henderson told Insogna to stop the vehicle. *See id.* at Ex. 3, Ortlieb Dep. 117:7-118:21.

19.     Ortlieb observed four males standing near 222 Lenox Road when his attention was drawn to one of them because that individual tried to hide behind the others. *Id.* at 116:15-117:3.

20.     After the individual ducked behind the others, Henderson began to exit the vehicle, after which the individual began to run down the sidewalk and down the alleyway. *Id.* at 131:24-133:17.

21.     Ortlieb only saw the individual's face when he was initially standing in the group and never saw it again. *Id.* at 144:17-145:2.

22.     When Ortlieb observed the group, the street was artificially lit by street lights, but he could not say where they were, and it was dark outside. *Id.* at 186:19-187:4.

23.     Insogna, the operator of the police vehicle, who is not a defendant in the action, testified that the area where the group of individuals was standing was dark and not well lit.  *See id.* at Ex. 10, Insogna Dep. 43:21-44:2, 70:17-71:13.

24.     Non-party Lieutenant Frank Sciortino, who responded to the scene after the purported shooting, also testified that the area was dimly lit.  *See id.* at Ex. 1, Sciortino Dep. 100:21-101:6.

25.     Insogna further testified that approximately two to five seconds elapsed between the time Henderson told him to stop the vehicle and when the individual took off running.  *See id.* at Ex. 10, Insogna Dep. 94:25-95:16.

26.     After the male ran down the alleyway, Henderson, Seminara, and Ortlieb, in that order, pursued the individual down the alleyway.  *See id.* at Ex. 4, Seminara Dep.  164:7-14.

27.     When the individual reached the vicinity of the garbage shed in the alleyway, he purportedly reached his arm back behind him and discharged his weapon two times in the direction of Henderson, Seminara, and Ortlieb.  *Id.* at Ex. 4, Seminara Dep. 169:2-11, Ex. 11, Diagrams of Shooting.

28.     The individual then turned to his left, and then right, down the alleyway, and after turning the right hand corner of the alleyway, he purportedly reached back and fired his weapon again approximately two times.  *See id.* at Ex. 2, Henderson Dep. 147:10-148:25; Ex. 11, Diagrams of Shooting.

29.     After the individual fired the second time, Seminara and Henderson discharged their weapons six times and four times, respectively.  *See id.* at Ex. 11, Diagrams of Shooting; Ex. 4, Seminara Dep. 169:18-170:14; Ex. 2, Henderson Dep. 147:10-149:7.

30.     The individual then continued down the alleyway, entering the 222 Lenox Road through a door at the end of the alley.  *See id.* at Ex. 3, Ortlieb Dep. 138:24-142:10.

31.     After entering the building, the individual purportedly reached his arm out and fired approximately two more rounds at the officers.  *See id.* at Ex. 2, Henderson Dep. 155:12-21; Ex. 12, Final Firearms Discharge Report.

32.     After the individual purportedly fired his weapon a third time, Henderson discharged his weapon at the individual, firing four rounds.  *See id.* at Ex. 2, Henderson Dep. 153:25-157:12.

33.     Seminara also discharged his weapon, firing two shots.  *See id.* Ex. 4, Seminara Dep. 176:18-176:23.

34.     At this point, Ortlieb, too, fired his weapon, discharging three rounds.  *See id.* at Ex. 3, Ortlieb Dep. 145:11-14.

35.     Defendant Henderson, Seminara, and Ortlieb fired their weapons nineteen times in total.  *See id.* at Ex. 12, Final Firearms Discharge Report.

36.     Henderson, Seminara, Ortlieb, and Insogna all testified that bullets from the purported shooter were hitting the walls around them and/or came close to them.  *See id.* at Ex. 10, Insogna Dep. 80:5-10; Ex. 2, Henderson Dep. 148:19-25, Ex. 4, Seminara Dep. 166:16-20; Ex. 3, Ortlieb Dep. 138:7-17.

37.     Although Henderson, Seminara, Ortlieb, and Insogna testified that they were shot at approximately six (6) times, with bullets coming close to them in the alleyway, and an examination of their weapons revealed that they had collectively fired nineteen (19) shots, a thorough search of the scene just after the shooting on September 6, 2010 revealed eighteen (18)

shell casings consistent with the officers' own weapons, and eighteen (18) bullet fragments. *See* ¶¶ 28-36 *supra*; Klein Decl. Ex. 13, CSU Recap Sheet; Ex. 14, Property Clerk Invoice R470998.

38.     A nineteenth shell casing was purportedly discovered pursuant to a second search conducted on September 6, 2010, at approximately 2:45 p.m.  *See* Klein Decl. Ex. 15, CSU Scene Report; Ex. 16, Property Clerk Invoice R470999.

39.     Photographs taken during the first search for evidence, attached herewith as Exhibits 17-18, which depict the same area where the nineteenth shell casing was purportedly recovered during the second search, call into question whether the nineteenth shell casing depicted in Exhibits 19-20 was present during the first search.  *See id.* at Ex. 17-20, Crime Scene Photos.

40.     After the encounter ended, Ortlieb went over his radio to call in the purported shooting and gave a description of the suspect as a male, black, dark clothes.  *See id.* at Ex. 3, Ortlieb Dep. 147:25-148:22; Ex. 39 Radio Transmission 1 at 4:09; Radio Transmission 2 at 0:05, 2:29.

41.     When asked by the dispatcher for a more detailed description, Ortlieb did not provide one, and further conceded at his deposition that he could not have provided a more specific description.  *See id.* at Ex. 3, Ortlieb Dep.153:2-154:17; Ex. 39.

42.     Seminara also confirmed that male, black, with dark clothing was the best description that they could provide.  *See id.* at Ex. 4, Seminara 184:20-185:6.

43.     Seminara, Henderson, and Ortlieb were not mere victims of the shooting, but were actively part of the case and engaged in police work related to the incident, such as directing officers to question certain civilians, trying to get civilian identifications from people standing around, canvassing the area of the shooting, and/or having access to information

through their presence at the precinct where the investigation was occurring and through NYPD databases that a mere victim or complainant would not have access to. *See e.g.*, Ex. 2, Henderson Dep. 72:3-21; 74:2-75:19; Ex. 3, Ortlieb Dep. 103:6-9; 127:14-19; 159:19-24; 162:12-163:5; 167:11-22; Ex. 4, Seminara Dep. 73:2-17; 190:10-15; 211:20-214:19; 217:14-21; 228:5-17.

44.     Within about an hour of the shooting on September 6, 2010, Detective Devon Freed was assigned as the lead investigator to investigate the shooting. *See id.* at Ex. 6, Freed Dep. 9:4-11:21.

45.     As the lead investigator, Freed immediately went to 222 Lenox Road and assessed the scene of the shooting. *See id.* at Ex. 6, Freed Dep. 83:20-84:24.  Freed also had access to the crime scene unit documents. *Id.* 11:3-12.

46.     After assessing the scene, Freed returned to the 67th Police Precinct and next remembers interviewing witnesses at the precinct. *Id.* at 114:21-115:21.

47.     Freed was present and personally involved in the unlawful detention, interrogation, and coercion of an individual named Trevor Perez.  *See* Klein Decl. Ex. 6, Freed Dep. 99:23-102:10; PCS ¶¶ 48-54 *infra*.

48.     The coercive actions taken as to Mr. Perez included holding him handcuffed on the ground at 222 Lenox Road for an extended period of time and then bringing him to the 67th precinct in handcuffs. *See id.* at Ex. 21, Perez Dep. 34:8-36:11, 56:3-58:16.

49.     The coercive actions further included imprisoning Perez in an interrogation room, interrogating him in loud and aggressive tones, touching him in a threatening and intimidating manner about his shoulders, denying him food and drink, and pressuring him about giving someone up. *Id.* at 65:3-67:9, 71:12-99:5.

50.     During the interrogation, Perez was shown *one* photo.  The photo was of plaintiff Shane Rhooms.  Perez was told that this is the person he was going to give up.  *Id.* at 86:3-88:16, 98:23-99:5.

51.     In response to being shown the photo, Perez affirmatively told the interrogating detectives, one of whom was Freed by Freed's own admission, that he knew who plaintiff was, that he had not seen plaintiff anywhere near the shooting, and that plaintiff was not the guy they were looking for.  *Id.* at 87:16-19, 93:2-9; 108:24-109:12; *See* Klein Decl. Ex. 6, Freed Dep. 99:23-102:10.

52.     Perez was held in the interrogation room and interrogated for a couple of hours. *See id.* at Ex. 21, Perez Dep. 93:24-94:6.

53.     Perez was told by the detectives to give up the person in the photo, was given a pen and told what to write, and was told that he could leave only if he wrote the words that were dictated to him and then signed the photograph of Shane Rhooms.  *Id.* at 109:13-122:5.

54.     Perez felt threatened and that he had no choice.  On September 6, 2010, at approximately 4:30 a.m., Perez wrote what the detectives told him to write.  *Id.* at 116:21-122:5; Ex. 22, Perez Statement.

55.     Freed was present when Perez wrote the statement on the mugshot and he could not say for sure whether any other detectives were also present.  *See id.* at Ex. 6, Freed Dep. 192:25-193:7.

56.     Perez did not in fact observe any civilian shooter.  He was about to enter a corner store nearby when he first heard shots fired and never saw any civilian firing at the police.  *See id.* at Ex. 21, Perez Dep. 10:20-12:24, 20:10-22:9.

57.     No other civilian witness linked Shane Rhooms to the shooting other than Perez's false coerced identification.  *See id.* at Ex. 6, Freed Dep. 150:13-21; *See* PCS ¶¶ 48-54 *supra*.

58.     Freed did not memorialize his interview of Perez or Perez's identification of plaintiff in a DD5 form or complaint follow-up form, which was against proper procedure.  *See id.* at Ex. 6, Freed Dep. 124:20-128:24; Ex. 23, Enright Dep. 36:24-38:14; Ex. 5, Barrett Dep. 69:7-70:24.

59.     By failing to prepare a DD5 regarding Perez, Freed concealed that he was personally involved in the coercive interview of Perez.  *See id.* at Ex. 6, Freed Dep. 128:6-132:4.

60.     Approximately ten minutes after Perez was coerced into falsely implicating plaintiff, Detective Gregory Barrett prepared a photo array, at defendant Freed's request, which included plaintiff's photo.  *See id.* at Ex. 24, DD5 No. 23; Ex. 6, Freed Dep. 258:21-259:15.

61.     Had Perez not been coerced into implicating plaintiff, there would have been no basis to construct a photo array that included plaintiff's photo.  *See id.* at Ex. 6, Freed Dep. 259:23-260:11; 275:13-276:2.

62.     On September 6, 2010, at approximately 5:00 a.m., shortly after Perez's coerced false identification, Freed showed the photo array to Seminara only.  *See id.* at Ex. 25, DD5 No. 20; PCS ¶¶ 48-54 *supra*.

63.     Seminara had previously worked with Freed when Seminara was a police officer at the 67th Precinct.  *See id.* at Ex. 4, Seminara Dep. 25:22-26:14.

64.     Freed was friendlier with Seminara than he was with some other cops because he believed him to be a good cop and a good guy.  *See id.* at Ex. 6. Freed Dep. 51:18-52:5.

65.     Freed aided Seminara in picking plaintiff out of the photo array as evidenced by the fact that according to Seminara's own testimony, he did not have a sufficient opportunity to

see the face of the individual he claimed shot at him during the at most five second window he had to view the individual in a poorly lit area, and Seminara could not give a better description of the purported shooter than male, black, dark-colored clothing, at the time of the incident. *See id.* at Ex. 4, Seminara Dep. 141:24-142:9; 167:10-168:23; Ex. 10, Insogna Dep. 43:21-44:2, 70:17-71:13.

66.     Based on Seminara's fraudulent purported identification, defendant Freed prepared a "wanted poster" with a photograph of plaintiff prominently displayed on it. *See id.* at Ex. 26, DD5 No. 14; Ex. 27, Wanted Poster.

67.     Henderson knew that Seminara picked someone out of the photo array because he was aware that a wanted poster was prepared as a result. *See id.* at Ex. 2, Henderson Dep. 74:1-75:19.

68.     Henderson also testified that they all—referring to himself, Ortlieb, and Seminara—had access to the wanted poster with plaintiff's photo displayed on it. *See id.*

69.     Henderson definitely saw the wanted poster on September 6, 2010. *See id.* at 75:25-77:3.

70.     Freed was also sure that Ortlieb, Henderson, and Seminara had access to the wanted poster. *See id.* at Ex. 6, Freed Dep. 65:25-66:7.

71.     After learning that he was wanted by the police, plaintiff waited for his cousin Alhue Gayle to finish work, so that Gayle could accompany him to the precinct and verify his alibi. *See id.* at Ex. 7, Rhooms Dep. 99:11-102:25.

72.     Plaintiff and Gayle then went to the 67th Precinct together on the evening of September 6, 2010, arriving at approximately 6:00 p.m., at which time plaintiff was arrested. *See id.* at Ex. 7, Rhooms Dep. 103:20-104:1, Ex. 28, DD5 No. 25; Ex. 29, DD5 No. 31.

73.     At the precinct, a detective questioned Gayle separately from plaintiff, and Gayle confirmed plaintiff's alibi, including how plaintiff travelled to Gayle's home, what time plaintiff arrived at Gayle's house, that plaintiff travelled to Webster Hall with Gayle, that they arrived at Webster Hall around midnight, that they all stayed at the club until the concert ended around 5:00 a.m., and that he had pizza with plaintiff after the concert and then drove plaintiff back to Queens.  *See id.* at Ex. 30, Gayle Dep. 27:20-29:14, 33:3-35:4, 41:6-44:2.

74.     Defendants have not produced any discovery documenting the exculpatory statements Gayle provided to detectives.

75.     Plaintiff was also questioned by detectives, one of whom was Freed.  *See id.* at Ex. 7, Rhooms Dep. 105:11-107:23; Ex. 31, DD5 No. 26.

76.     On September 6, 2010 at approximately 1950 hours, plaintiff provided a detailed alibi statement to Freed, including a written and signed account of his whereabouts during the time of the shooting, which were consistent with the details Gayle provided to a detective at the 67th Precinct.  *See id.* at Ex. 6, Freed Dep. 17:8-20:18; Ex. 32, Rhooms' Statement; Ex. 30, Gayle Dep. 27:20-29:14, 33:3-35:4, 41:6-44:2.

77.     Plaintiff also provided his MetroCard to the detectives and informed the detectives that Webster Hall had surveillance cameras *See id.* at Ex. 7, Rhooms Dep. 107:11-14.

78.     The detectives took custody of plaintiff's cell phone when he surrendered.  *Id.* at 118:8-14.

79.     Defendant Freed ignored and/or failed to investigate the ample exculpatory evidence available to him, including Gayle's exculpatory statements, plaintiff's MetroCard, and the existence of exonerating surveillance video from Webster Hall.  *See id.* at Ex. 6, Freed Dep. 22:12-24:24, 26:7-29:20; Ex. 30, Gayle Dep. 27:20-29:14, 33:3-35:4, 41:6-44:2.

80.     Freed also ignored additional exculpatory cell phone evidence in the possession of the NYPD on September 6, 2010, which bears a fax time of 5:37, p.m., which was prior to plaintiff's surrender, that showed a series of calls were made from plaintiff's cell phone, originating in Manhattan, near Webster Hall, beginning at 12:25 a.m. on September 6, 2010, during the window of time when the shooting purportedly occurred and when plaintiff claimed he was in Manhattan at that location.  Ex. 33, Cell Phone Records.

81.     Freed ignored the cell phone evidence despite the fact that plaintiff's cell phone had proven to be a reliable source for tracking plaintiff.  In that regard, detectives used plaintiff's cell phone number to track plaintiff's whereabouts during the day of September 6, 2010, including tracking his surrender to the 67th precinct.  *See id.* at Ex. 34, Kienle Dep. 63:6-64:15.

82.     On September 7, 2010, plaintiff was placed in a lineup, which was viewed by defendants Seminara, Henderson, and Ortlieb, who all falsely identified plaintiff as the shooter. *See id.* at Ex. 35, DD5 Nos. 27-29.

83.     Plaintiff was the only individual in the lineup, who like the purported shooter, was wearing dark pants.  *See id.*

84.     Seminara's lineup identification was tainted by the prior photo array insofar as Seminara admits that he referenced the photo array photo in his mind when he participated in the lineup and by the fact that plaintiff was the only individual in the lineup, who like the purported shooter, was wearing dark pants.  *See id.* at Ex. 4, Seminara Dep. 199:9-14; Ex. 35.

85.     Freed further acknowledged that showing the photo array to Seminara before the lineup was suggestive, and claimed he did it over his own protests only because he was told to do so by his supervisor, Lieutenant Frank Sciortino.  *See id.* at Ex. 6, Freed Dep. 106:7-107:14.

86. Sciortino had no recollection of any discussion with Freed about the appropriateness of doing a photo array with Seminara. *See id.* at Ex. 1, Sciortino Dep. 91:21-92:11.

87. Defendant Henderson's lineup identification was tainted by his viewing of the wanted poster insofar as he admits that he looked at the wanted poster photo earlier in the day, prior to the lineup, and that when he saw the picture on the poster, he believed the person depicted on the poster to be the shooter, and by the fact that plaintiff was the only individual in the lineup wearing dark pants. *See id.* at Ex. 2, Henderson Dep. 88:15-89:7; Ex. 35.

88. Ortlieb's subsequent lineup identification was also tainted by his exposure to the wanted poster and by the fact that plaintiff is the only individual in the lineup wearing dark pants. *See id.* at Ex. 2, Henderson Dep. 74:1-75:19; Ex. 6 Freed Dep. 65:25-66:7; Ex. 35.

89. That the lineup identifications by Henderson and Ortlieb were aided by having seen a photo of plaintiff prior to the lineup can also be inferred from the fact that they too did not have a sufficient opportunity to see the face of the individual they claimed shot at them during the at most seconds long window they had to view the individual, in the dark, and they could not give a better description of the purported shooter than male, black, dark-colored clothing at the time of the incident. *See* PCS ¶¶ 5-10; 18-22 *supra*.

90. That the lineups were tainted is further supported by testimony from Freed's supervisor, Lieutenant Michael Enright, who testified that if the witnesses saw the wanted poster it would call the validity of the lineup into question. *See id.* at Ex. 23, Enright Dep. 62:11-17, 63:5-22.

91. Enright further confirmed that all purported witnesses, including Perez, should have viewed the lineup. *See id.* at 67:6-12.

92.     Assistant District Attorney Lew Lieberman (hereinafter "ADA Lieberman"), the ADA from the Kings County District Attorney's Office who was assigned the prosecution of plaintiff's case, also confirmed that he would have wanted to know if Seminara, Ortlieb, and Henderson saw the wanted poster before the lineup, and would have needed to disclose this to the defense. *See id.* at Ex. 8, Lieberman Dep. 129:11-130:15.

93.     ADA Lieberman also confirmed that there was no reason to do a photo array if a credible identification had already been obtained through Perez. *Id.* at 119:9-23.

94.     After plaintiff was identified in the tainted lineups, he was formally arrested, arraigned on charges of violating New York Penal Law §§ 110/125.25(1)(I), attempted murder in the second degree; 110/1255.26(1)(A), attempted aggravated murder; 110/125.27(1)(A)(I), attempted murder in the first degree; 2365.03(1)(B), criminal possession of a weapon in the second degree; and 265.03(3) and criminal possession of a weapon in the second degree. Plaintiff was consequently imprisoned at Rikers Island. *See id.* at Ex. 7, Rhooms Dep.125:6-129:23; Ex. 9, Crim. Ct. Compl.

95.     Plaintiff was subjected to handcuffing during his arrest. *See id.* at Ex. 7, Rhooms Dep. 125:15-20.

96.     Defendant Ortlieb participated in the prosecution of plaintiff by providing information to the ADA resulting in the drawing up of the criminal complaint against plaintiff. *See id.* at Ex. 3, Ortlieb Dep. 20:4-19.

97.     Defendant Henderson also gave statements to the Kings County District Attorney's Office which contributed to the drawing up of a complaint against plaintiff. *See id.* at Ex. 2, Henderson Dep. 33:22-34:25.

98.     Defendant Seminara also provided information that played a role in the prosecution of plaintiff.  *See id.* at Ex. 4, Seminara Dep. 201:18-205:7.

99.     Seminara, Ortlieb, Henderson, and Freed all met with ADA Lieberman prior to Lieberman's presentation of the case against plaintiff to the grand jury.  *See id.* at Ex. 8, Lieberman Dep. 15:14-21, 23:17-24:12.

100.     The prosecution was started, in part, based on the allegations of defendants Seminara, Ortlieb, and Henderson, who Lieberman understood all wanted to press charges.  *Id.* at 152:15-154:5; 213:4-9.

101.     Defendant Freed continued the prosecution of plaintiff as well by withholding Perez's name and contact information from Lieberman, falsely informing ADA Lieberman that Perez was a confidential informant, which he was not, withholding the photo Perez was coerced into signing from the District Attorney's Office, failing to create a DD5 report, and withholding access to Trevor Perez even after ADA Lieberman asked defendant Freed on at least two occasions to produce Perez to be interviewed by Lieberman.  *Id.* at 30:20-32:14, 35:2-37:4; 40:2-41:3, 56:5-57:21, 99:18-22, 105:4-106:18.

102.     The first time ADA Lieberman learned of or saw the photo Perez was coerced into signing was at his deposition.  *Id.* at 125:15-126:13.  Prior to that, ADA Lieberman believed that Perez and led Freed to plaintiff by giving Freed a street name.  *Id.* at 53:15-54:5.

103.     Based on the information Lieberman obtained from Freed, Seminara, Ortlieb, and Henderson, ADA Lieberman presented his case against plaintiff to the grand jury, resulting in plaintiff's indictment on September 10, 2010.  *Id.* at 15:14-21:8; Defs.' 56.1 ¶ 50; Ex. 36, Indictment.

104.     Defendant Seminara provided false testimony to the grand jury, to wit: that on September 6, 2010, an individual fired at him multiple times and that when he viewed a lineup on September 7, 2010, he recognized Shane Rhooms as the individual who he claimed fired at him. *See id.* at Ex. 37, Grand Jury Minutes at 10:1-13:3.

105.     Defendant Henderson provided false testimony to the grand jury, to wit: that on September 6, 2010, an individual fired at him multiple times, and that when he viewed a lineup on September 7, 2010, he recognized Shane Rhooms as the individual who he claimed fired at him. *See id*. at 17:11-19:23.

106.     After plaintiff's indictment, Freed and ADA Lieberman obtained video surveillance from Webster Hall. *See id.* at Ex. 8, Lieberman Dep. 71:21-72:5, 165:14-166:22.

107.     Plaintiff's cousin, Alhue Gayle, met with ADA Lieberman and defendant Freed at the Kings County District Attorney's office and showed ADA Lieberman and Freed the footage which confirmed plaintiff was at Webster Hall at the time of the shooting. *See id.* at Ex. 30, Gayle Dep. 49:15-50:23; Ex. 8, Lieberman 165:14-170:15.

108.     Around this time, plaintiff was also administered and passed a lie detector test. *See id.* at Ex. 8, Lieberman Dep. 170:18-22.

109.     On September 24, 2010, sometime shortly after viewing the footage, ADA Lieberman had plaintiff's case advanced and consented to plaintiff's release from Rikers Island. *Id.* at 165:4-166:6.

110.     Despite confirmation of plaintiff's actual innocence via the video and lie detector test, the felony charges lodged against plaintiff were not dismissed until December 21, 2010. *See id.* at Ex. 38, Certificate of Disposition.

Dated: New York, New York
         March 16, 2016

                                        BRETT H. KLEIN, ESQ., PLLC
                                        Attorneys for the Plaintiff
                                        305 Broadway, Suite 600
                                        New York, New York 10007
                                        (212) 335-0132

                                        By:     __/s/ Brett H. Klein_____
                                                BRETT H. KLEIN (BK4744)
                                                LISSA GREEN-STARK (LG7510)

24

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------------------------------X

SHANE RHOOMS,

                              Plaintiff,

                                                             11 CV 5910

       -against-                                      (PKC) (RER)

CITY OF NEW YORK, ROBERT ORTLIEB, Individually,
ROBERT HENDERSON, Individually, JOSEPH SEMINARA,
Individually, DEVON FREED, Individually, and JOHN DOE 1,
Individually, (the name John Doe being fictitious, as the true
name is presently unknown),

                              Defendants.

--------------------------------------------------------------------------------X

**PLAINTIFF'S RESPONSE TO DEFENDANTS' LOCAL RULE 56.1 STATEMENT
AND COUNTER STATEMENT OF DISPUTED MATERIAL FACTS FOR TRIAL**

**BRETT H. KLEIN, ESQ., PLLC**
Attorneys for the Plaintiff
305 Broadway, Suite 600
New York, New York 10007
(212) 335-0132