1

2   UNITED STATES DISTRICT COURT
    EASTERN DISTRICT OF NEW YORK
3   ----------------------------------------X
    SHANE RHOOMS,
4
                                PLAINTIFF,
5
6          -against-          Case No.:
                              1:11-cv-05910
7                             (PKC-RER)

8
    CITY OF NEW YORK, DEVON FREED, ROBERT
9   ORTLIEB, ROBERT HENDERSON, JOSEPH SEMINARA
    and JOHN and JANE DOE 1 THROUGH 10,
10  INDIVIDUALLY (the names John and Jane Doe
    being fictitious, as the names are
11  presently unknown),

12                              DEFENDANTS.
    ----------------------------------------X
13

14                    DATE:  December 16, 2013

15                    TIME:  10:10 A.M.

16

17          DEPOSITION of the Defendant,

18  DEVON FREED, taken by the Plaintiff,

19  pursuant to a Court Order and to the

20  Federal Rules of Civil Procedure, held at

21  the offices of Leventhal & Klein, LLP, 45

22  Main Street, Brooklyn, New York 11201,

23  before Gary Merola, a Notary Public of the

24  State of New York.

25

```
 1                      D. FREED
 2   having a conversation with him about what
 3   happened?
 4          A.    What I can say is that being
 5   the lead detective in a police involved
 6   shooting on several occasions, I have
 7   always sat in on GO15s, whether I announced
 8   my name or didn't announce my name, I can't
 9   recall.
10              It would be the normal
11   procedure for me to sit in on those
12   interviews and I have no specific
13   recollection of that GO15 per se.
14          Q.    Lieutenant Henderson and former
15   Detective Seminara who is now former
16   sergeant now Lieutenant Seminara gave their
17   GO interviews several months later.
18              Do you have a recollection of
19   being present at their GO interviews?
20          A.    No.
21          Q.    You said there were other GO
22   interviews that you were present at.  It
23   sounded like more than one.
24          A.    Let me be more specific.  I
25   don't have a specific recollection of any
```

                              D. FREED

1

2     specific GO15, but if they were conducted

3     within a timely fashion, during the

4     immediacy of the investigation I would have

5     sat in on it.

6          Q.    If it was months later, let's

7     say, you may not have?

8          A.    Correct.

9          Q.    You don't have a specific

10    recollection sitting here today of any of

11    those GO interviews?

12         A.    Correct.

13         Q.    You were never interviewed

14    yourself by anyone that you recall about

15    your involvement other than your attorneys

16    and here at this deposition today?

17         A.    That is correct.

18         Q.    In terms of documents that you

19    prepared, is it fair to say you prepared an

20    extensive file on this case?

21         A.    Yes.

22         Q.    Did you review your file before

23    coming here today?

24         A.    Today, no.

25         Q.    Recently?

```
 1                      D. FREED
 2          A.    Yes.
 3          Q.    What does your file consist of
 4   just in terms of does it consist of DD5s,
 5   crime scene photos?
 6                Can you tell me in your own
 7   words what your file consists of?
 8          A.    DD5s, computer paperwork,
 9   identification paperwork, crime scene
10   paperwork and anything else that would have
11   been helpful in persuing this
12   investigation.
13          Q.    And notes that you took as you
14   went along?
15          A.    Yes.
16          Q.    The shooting occurred, do you
17   recall it being around 12:20 or 12:30 A.M.?
18          A.    Yes, right after midnight.
19          Q.    And you were assigned
20   immediately?
21          A.    Yes.
22          Q.    Would it be fair to say within
23   an hour of the shooting or even less?
24          A.    Yes.
25          Q.    Did you do your DD5s as you
```

```
 1                         D. FREED
 2   on the 6th, how long after the lineups did
 3   you obtain the DD5 from Webster Hall?
 4          A.    I believe it was within a week.
 5          Q.    Was it before or after Rhooms
 6   was indicted?
 7          A.    I would say after.
 8          Q.    On the day of the arrest and we
 9   will go over the time, but my understanding
10   it was around 6:00 that he surrendered to
11   the precinct and Detective Wright was there
12   when he surrendered.
13               Do you have a recollection of
14   that?
15          A.    Vaguely.  I was home and I got
16   a phone call.
17          Q.    Did you respond to the precinct
18   right away?
19          A.    Yes.
20          Q.    You went to the 67th squad?
21          A.    Yes.
22          Q.    Where was Mr. Rhooms, was he in
23   a cell?
24          A.    I don't know if he was in a
25   cell or an interview room.
```

```
 1                        D. FREED
 2         Q.     Did you interview him pretty
 3   much right away?
 4         A.     Within a couple of hours.
 5         Q.     Did he tell you his whereabouts
 6   at the time of the alleged shooting?
 7         A.     He did.
 8         Q.     And he said he was at Webster
 9   Hall?
10         A.     Yeah.  He was even more
11   detailed than that.  He gave a specific
12   account of his whereabouts.
13         Q.     In terms of what buses he took?
14         A.     A hundred percent.
15         Q.     And he provided his Metro card
16   and you wrote down the Metro card
17   information?
18         A.     Yes.
19         Q.     What other types of information
20   did you learn about his specific
21   whereabouts?
22         A.     I don't want to say, we might
23   have obtained cell phone records.  I don't
24   want to say for sure.
25         Q.     Let's see if I can jog your
```

```
 1                    D. FREED
 2   memory.
 3              What I'm going to do, I will
 4   show you the Bates numbered pages unless
 5   you think we should mark them and let's see
 6   if this refreshes his memory.
 7              MS. JOYCE:  That is fine.
 8         Q.    On the part of the notebook
 9   that you took some information.  It is
10   Bates number New York City 4265.  It starts
11   with Alhue, Gaye.  It starts with him.
12              Then Page 6266, the information
13   about Seian, Gail, and then you were
14   talking about information about Mr. Rhooms
15   on Page 4267.
16              Specifically on 4268 it looks
17   like there is bus information and other
18   details going into 4269.  And then some
19   more bus information underneath Lou
20   Lieberman's name on Page 4270.  I think
21   that is where it ends.
22              So starting at 4265, take a
23   moment and look at those pages.
24         A.    Okay.
25         Q.    Just generally, are those some
```

```
 1                    D. FREED
 2    of the pages in your notebook?
 3         A.    Yes.
 4         Q.    Where you write down the
 5    information he gave you?
 6         A.    Yes.
 7         Q.    Is that information where you
 8    wrote the bus information, bus to train,
 9    are those times next to it?
10         A.    I believe so, yeah.
11         Q.    And he was very detailed about
12    what transfers he made and where he took a
13    train, where he walked, for instance?
14         A.    Yeah.
15         Q.    Was this information he gave
16    you on September 6, 2010 at or around
17    6:00 p.m.?
18         A.    Yeah.
19         Q.    Was he under arrest when he
20    gave that information?
21         A.    Yes.
22         Q.    What was the basis for the
23    arrest at that point?
24         A.    The identification by Seminara?
25         Q.    Seminara?
```

```
 1                          D. FREED
 2          A.     Yeah.
 3          Q.     That was the photo array you
 4   had?
 5          A.     Yeah.
 6          Q.     Is the photo array hit enough
 7   to make an arrest?
 8          A.     Yes.
 9          Q.     When Rhooms came in and gave
10   you that information, did you remark like
11   you did today about how detailed it was?
12          A.     Personally.  I definitely took
13   notes in my head.
14          Q.     Would you say he was unusually
15   detailed?
16          A.     Yes.
17          Q.     In your own words if you can
18   tell me why in comparison to other alibis
19   what you received why this was remarkable
20   to you?
21          A.     Well, I had two thoughts in
22   mind.
23                 First of all, you rarely get a
24   detailed alibi to that extent.  The two
25   thoughts in my head were either he's really
```

```
 1                      D. FREED
 2   trying to protect himself and he is really
 3   guilty or, you know, maybe he's not guilty
 4   and I guess he should come out and say it.
 5               At that point I already had
 6   doubts in my mind whether in fact he was or
 7   was not the right person.  But with the
 8   information that I had prior to speaking to
 9   him and prior to the alibi my hands were
10   tied, there was probable cause to arrest
11   and he had to be arrested.
12        Q.    If you had doubts in your mind
13   does that not affect the probable cause
14   analysis that you have to make as an
15   arresting detective?
16               In other words, probable cause
17   is reason to believe that a person
18   committed a crime?
19        A.    Right.
20        Q.    You felt there was some reason
21   to believe that maybe he did not commit the
22   crime, correct?
23        A.    I felt that his alibi was much
24   too detailed for and either he definitely
25   committed the crime or we had the wrong
```

```
 1                    D. FREED
 2    person.  That was from my experience of
 3    interviewing thousands of people.
 4           Q.    Did you discuss that opinion
 5    that you formed with anyone else?
 6           A.    At that time, no.
 7           Q.    At the time Rhooms surrendered
 8    and you obtained this information, were you
 9    at that time the designated arresting
10    detective for this case?
11           A.    Yes.
12           Q.    In terms of the information
13    that you got, did Rhooms produce a Metro
14    card to you?
15           A.    I don't know if -- he didn't
16    really come in and say this is where I was,
17    here is my Metro card.  I believe I
18    inquired in regards to the Metro card and
19    then it was produced.
20                 I don't remember if he gave it
21    to me or if his brother came in at a later
22    time.  I don't remember exactly how I got
23    posession of the Metro card.
24           Q.    But before the lineup?
25           A.    Before the lineup?
```

```
 1                      D. FREED
 2         Q.    Did you have the Metro card
 3    before the lineup?
 4         A.    None of that information from
 5    the Metro card was done until after the
 6    lineup and after the arrest.  Well after.
 7         Q.    When you say "well after", was
 8    it on the 7th later the next day?
 9         A.    I don't know what day it was.
10    I probably and again I don't want to be
11    specific, don't hold me down to the date or
12    time, but I would say I didn't get into,
13    really get into trying to discover that
14    alibi for at least twenty-four hours,
15    forty-eight hours after the arrest.
16         Q.    Is a Metro card -- have you
17    ever run a Metro card on a suspect or a
18    person to determine there whereabouts?
19         A.    I had it in the past.  It would
20    not be normal procedure for me.
21         Q.    Is it something that is
22    readily, that is not too difficult to do if
23    you needed to do?
24         A.    It's a phone call.
25         Q.    It is a phone call to who, New
```

```
1                        D. FREED
2    card could have been his girlfriend's, she
3    could have been in Queens and here is my
4    Metro card for your alibi.  It could have
5    been anybody's Metro card who was in Queens
6    at that time.
7         Q.     Information about Webster Hall.
8              Did you have knowledge on the
9    date of the arrest that Webster had or
10   likely had surveillance video?
11        A.     No. I surmised that all big
12   clubs in Manhattan now all have intense
13   video surveillance.  There was a new,
14   unbeknownst to me I don't go to clubs any
15   more, but now when they check your I.D.s
16   they put your New York State license
17   through a machine that actually records who
18   you are.  That technology I did not know
19   until I was in fact in contact with Webster
20   Hall.
21        Q.     Was that technology in use with
22   the license or I.D. in September of 2010?
23        A.     Yeah.
24        Q.     In terms of Rhooms giving you
25   specific details about being in Webster
```

```
 1                    D. FREED
 2  Hall, did you, did he tell you that it was
 3  at the time of the shooting that he was at
 4  Webster Hall?
 5       A.    He said he was at Webster Hall
 6  at this time.
 7       Q.    Did you make any phone calls to
 8  Webster Hall while he was in custody to
 9  check it out?
10       A.    No.
11       Q.    Why not?
12       A.    That would not be -- it is not
13  incumbent upon me to prove his alibi.
14            It is incumbent upon me to
15  conduct my investigation and at that point
16  there was probable cause to arrest and
17  that's what we did.
18            Then subsequent to that was on
19  my own behalf of doing it.  Like I said
20  earlier I had a feeling, you know, it was
21  something in my mind that said that this
22  alibi needed to be investigated further.
23            Because nobody wants to put
24  anybody in jail who doesn't deserve to be
25  in jail.  There is no alibi for me to solve
```

```
 1                        D. FREED
 2    or not dissolve this case.
 3                   I retired a first grade
 4    detective.  I'm at the top of my
 5    profession, okay and was chosen for this
 6    investigation because of who I was, so
 7    whether I solve it or don't solve it it
 8    meant nothing to me.  It is not a feather
 9    in me cap or a mark against me.
10                   But at the end of the day our
11    job is to put guilty people in jail and
12    there was something about this alibi that I
13    felt needed to be investigated further even
14    though there was probable cause to arrest
15    him.
16         Q.    If you had been able to
17    corroborate the video that ultimately ended
18    up in your file, if you had been able to
19    see that video or obtain it on the date of
20    the arrest, would you have proceeded with
21    the arrest?
22                   MS. JOYCE:  Objection.
23                   You can answer.
24         A.    I can't answer that.
25         Q.    Well, you said that you saw the
```

1                    D. FREED
2    video, it is part of your file, right?
3         A.    Yes.
4         Q.    And you observed Shane Rhooms
5    in the video at Webster Hall around the
6    time of the shooting, correct?
7         A.    Right.
8         Q.    So, if you had that video while
9    Rhooms was still in custody before a
10   complaint was drawn up by the DA's office,
11   what would you have done?
12              MS. JOYCE:  Objection.
13              You can answer.
14        A.    I don't know.  Like I said
15   there was probable cause.  We had an
16   identification from a police officer along
17   with other corroborating information so.
18        Q.    Well, did the video contradict
19   the probable cause that you had?
20        A.    Yes.
21        Q.    Just hypothetically, I know you
22   didn't have the video, but if you had it,
23   Shane Rhooms surrendered at 6:00 and let's
24   say by 9:00 p.m. you had somebody run up to
25   Webster Hall and get the DVD or video,

```
 1                        D. FREED
 2    to get together for this year, right?
 3         A.    We got together in September.
 4         Q.    Did this case come up at all
 5    when you saw him?
 6         A.    No.
 7         Q.    Did he let you know that he
 8    even had a deposition?
 9         A.    No.
10         Q.    What about Joe Seminara, did
11    you know him?
12         A.    Just from downstairs.
13         Q.    When you say from downstairs --
14         A.    He was a cop.
15         Q.    Did you ever have any problems
16    with him?
17         A.    No.
18         Q.    Did you ever have any good
19    positive situations with him prior to this?
20         A.    What I would say I knew that he
21    was a good cop so I was probably more
22    friendly with him than others because he
23    was a good cop out in the street.
24               I kind of have a personality, I
25    could have been very abrasive to guys that
```

```
 1                    D. FREED
 2    I feel are good guys and Joe was a good
 3    guy.  That is a good way to put it.
 4              I won't speak to you if you had
 5    less than five years on the job.
 6         Q.    What did you do when you heard
 7    the yelling over the radio?
 8         A.    We ascertained the location and
 9    we put our coats on and went out.
10         Q.    Who was there, to the best of
11    your recollection?
12         A.    Greg Barrett, I think Enright
13    was there already, I probably went out with
14    Enright, you know what, I can't say who was
15    definitely working that night.  I can tell
16    you the names of the guys on my team.
17         Q.    Was Michael Enright your
18    supervisor that day?
19         A.    Yes.
20         Q.    Was Frank Sciortino on that
21    team?
22         A.    Yeah, I think he was working.
23    I believe he was newly assigned to the
24    office then too.  This was like his first
25    fiasco.
```

```
 1                    D. FREED
 2          A.    Yes.
 3          Q.    And because the person, if the
 4   person shot at anybody, it would be a big
 5   deal, but if he shot at three supervisors,
 6   it was a very serious investigation to find
 7   this person?
 8               MS. JOYCE:  Objection.  He can
 9           answer it.
10          A.    Yeah.
11          Q.    Do you remember showing this to
12   Rob Ortlieb?
13          A.    I did not show this wanted
14   poster to anybody.
15          Q.    In terms of it being
16   distributed borough wide.  Let's talk about
17   how it was distributed in the 67.
18               Were they posted on the front
19   door of the precinct?  Where would they
20   have been posted?
21          A.    Most likely it would have been
22   a stack of them at the front desk where the
23   sergeant sits, there might have been one on
24   the wall.  Not plastered like wallpaper.
25          Q.    Did Rob Ortlieb, Rob Henderson
```

```
 1                      D. FREED
 2    and Joe Seminara have access to the wanted
 3    poster on September 6th?
 4                  MS. JOYCE:  Objection.  You can
 5             answer if you know.
 6           A.    I don't know.  I'm sure they
 7    did.
 8           Q.    If they were at the precinct
 9    that day, would they have the access to it?
10           A.    Sure.
11           Q.    Let's talk a little bit about
12    background.
13                 You joined the department in
14    '93?
15           A.    Yeah.
16           Q.    Is that when you entered the
17    academy and graduated from the academy?
18           A.    Yes.
19           Q.    From there where were you
20    assigned?
21           A.    The 67.
22           Q.    Were you there until you
23    retired?
24           A.    Yup.
25           Q.    Did you have any intervening
```

```
 1                    D. FREED
 2   obligation to let them know, one way or the
 3   other, I'm not saying that you did, as both
 4   victim and fellow officers?
 5        A.    Did I feel an obligation to let
 6   them know?
 7        Q.    That this is how the
 8   investigation worked out and I think it is
 9   the wrong guy?
10        A.    No.
11        Q.    Did you feel uncomfortable that
12   was the wrong guy when you knew it was
13   three of them, not one, not two, but three
14   that Rhooms was the wrong guy?
15        A.    Did I feel uncomfortable, no.
16        Q.    When you got the investigation,
17   did you immediately learn whether they were
18   eyewitnesses to the shooting?
19        A.    Did I immediately learn?
20        Q.    When you get the case, did you
21   leave the squad office, did you go out to
22   222 Lenox right away?
23        A.    Yes.
24        Q.    Do you remember who was with
25   you?  Did go with Barrett or just whoever
```

```
 1                      D. FREED
 2    was there?
 3           A.    I don't remember specifically,
 4    but it would probably have been Barrett.
 5           Q.    When you got to 222, what is
 6    the first thing that you did?
 7           A.    I assessed the scene.
 8           Q.    How did you do that?  Did you
 9    virtually assess it, did you talk to
10    victims?
11           A.    I walked around, I didn't speak
12    to the victims immediately.  Probably, I
13    don't remember specifically, I could say
14    what my normal behavior would have been.
15                 I would have walked up to the
16    scene, assessed it, I probably approached
17    the head supervisor who was on the scene.
18           Q.    Do you know who that was?
19           A.    I don't.  Like I said just a
20    general trying to take in the whole
21    situation, look for cameras.
22           Q.    Let me just finish the line
23    that I was going before so we are not
24    jumping around in many places.
25                 When you became a third grade
```

```
 1                    D. FREED
 2   they interviewed?
 3        A.    They were that night.
 4        Q.    And this information that
 5   Trevor said, those are the buddies --
 6        A.    Those guys hangs out with the
 7   guy that I saw shooting at the cops and
 8   then running away.
 9        Q.    Now, this was conveyed to you
10   by the police officers that brought Trevor
11   Perez in?
12        A.    At first by the cops, they said
13   something to the effect of this guy pointed
14   these two guys out as being friends with
15   the guy that he saw shooting the gun.
16        Q.    And you don't know who those
17   other two guys are?
18        A.    I mean there are interviews of
19   that.
20        Q.    Two guys that were in the
21   precinct that morning as well?
22        A.    Correct.
23        Q.    Did you interview those two
24   guys yourself?
25        A.    Yes.
```

```
 1                           D. FREED
 2          Q.     And Trevor Perez yourself?
 3          A.     Yes.
 4          Q.     In what order did you do it?
 5          A.     I don't recall.
 6          Q.     Is there any documentation
 7    other than the DD5s of what order you did
 8    them?
 9          A.     No.
10          Q.     Why do you believe Trevor Perez
11    was the super of the building?
12          A.     The cops that brought him to me
13    said that he was the super and he said he
14    was the super.
15                 And then I believe that after I
16    questioned him about being a super he was
17    well like I'm more of a porter.
18          Q.     Did you ever verify what his
19    job was?
20          A.     No.
21          Q.     Was the two cops that brought
22    him to you or made him known to you?
23          A.     Yeah.
24          Q.     Were they uniform or detective?
25          A.     I don't remember.
```

```
 1                      D. FREED
 2         Q.     No idea who they were?
 3         A.     No.
 4         Q.     Did they stay with him or you
 5    when you interviewed Trevor Perez?
 6         A.     They were not with me during
 7    the interview.  As far as being with him in
 8    the building I'm sure they were.
 9         Q.     So, when you read this
10    paragraph 23-D on page New York City 4112,
11    that statement of important witness,
12    eyewitness who wishes not to be identified
13    states that the individual who fired the
14    gun towards the police is known to sell
15    drugs in the vicinity of 222 Lenox Road.
16    You're certain hearing that that refers to
17    Trevor Perez?
18         A.     Yes.
19         Q.     Could it refer to anybody else?
20         A.     No.
21         Q.     Other than yourself who would
22    have known of this information?
23              Who could have provided this
24    information to Sciortino to this report?
25              MS. JOYCE:  Objection.
```

```
 1                        D. FREED
 2          A.    I don't know.
 3          Q.    Do you know of anyone else who
 4   was involved in speaking to Trevor Perez?
 5          A.    Nobody spoke to Trevor Perez.
 6          Q.    Was anyone with you when you
 7   spoke to Trevor Perez?
 8          A.    I believe Barrett was.
 9          Q.    Anyone else?
10          A.    No.
11          Q.    Anyone come in or out during
12   the interview of Perez?
13          A.    Absolutely not.
14          Q.    You have come to learn that
15   Trevor Perez was questioned in a deposition
16   a few weeks ago?
17          A.    Yes.
18          Q.    Prior to learning that he was
19   at a deposition, did you have a
20   recollection of questioning Trevor Perez on
21   the morning of the incident?
22          A.    Prior to the deposition?
23          Q.    Yes, in your mind.
24          A.    Did I speak to Trevor the
25   morning --
```

```
 1                     D. FREED
 2        A.    Probably when I got done with
 3    the interview with him.
 4        Q.    You would have spoken to
 5    Enright?
 6        A.    Hang on.  Let me withdraw that.
 7    I'm thinking about the Seminara photo
 8    array.
 9              After interviewing Perez and
10    after interviewing the friend that he had
11    pointed out, we, I conducted several
12    computer checks looking for arrest
13    associates, specifically the two other
14    witnesses that mentioned the name Shane as
15    being there prior to the shooting and
16    through those computer checks came up with
17    the photo of Shane Rhooms.
18              Then I showed that photo to
19    Perez and that was my call.
20        Q.    So, with whom was there an
21    issue about showing photos that Sciortino
22    or Enright was involved with?
23        A.    At a later time we did a photo
24    array with, I believe, Seminara and that
25    was against what I would have wanted to be
```

```
  1                    D. FREED
  2   done, but they felt it was necessary so
  3   they overrode my decision.
  4        Q.    Why did they think it was
  5   necessary?
  6        A.    I can't say why they thought it
  7   was necessary.
  8        Q.    They didn't tell you?  You
  9   didn't debate it?
 10        A.    I debated it, by showing a
 11   photo array prior to a lineup would be
 12   suggestive and they felt there would be
 13   enough time in between, that's what they
 14   wanted.
 15        Q.    Did they know that the wanted
 16   posters were also being circulated through
 17   the precinct for view by the officers, the
 18   witness officers?
 19             MS. JOYCE:  Objection.
 20             You can answer that.
 21        A.    I'm sure they did.
 22        Q.    So, other than saying there
 23   would be enough time that would pass, did
 24   they have another reason for Seminara to
 25   view the photo array?
```

1                    D. FREED
2    when it happened.  I just don't have a
3    specific recollection of speaking to them
4    there.
5         Q.    My understanding they stayed
6    there a little while until they went to the
7    hospital?
8         A.    Yeah.
9         Q.    They were there for a good
10   half-hour or more, but you don't remember
11   seeing them?
12        A.    I repeat myself, I don't have a
13   specific recollection of speaking to them
14   there.
15        Q.    Okay.
16        A.    I mean if it is documented in
17   the DD5 maybe I did.
18        Q.    Do you need your DD5s to answer
19   your questions today?  Do you lack any
20   independent recollection of this
21   investigation?
22        A.    Do I lack --
23        Q.    Do you have any independent
24   recollection of this investigation?
25        A.    I don't know what you mean.

```
 1                    D. FREED
 2         Q.     Sitting here today you don't
 3    remember specifically what you did at the
 4    scene?
 5         A.     Right.
 6         Q.     Do you remember anything
 7    specific you did at all on the morning of
 8    September 6th outside of what is in the
 9    paperwork?
10         A.     Outside of what is in the
11    paperwork, no.
12         Q.     In other words, the interview
13    of Trevor Perez, do you remember it other
14    than --
15         A.     I remember speaking to him,
16    yeah.
17         Q.     That is what I mean.  Do you
18    remember doing or speaking to anyone at 222
19    Lenox?
20         A.     At that time, no.
21         Q.     So, you went to the scene and
22    at some point you got back to the precinct?
23         A.     Correct.
24         Q.     What did you do when you got
25    back to the precinct, what is the first
```

```
 1                    D. FREED
 2   thing that you remember?
 3         A.    I got a cup of coffee.  I don't
 4   know.  I might have done computer checks on
 5   the building.  Nothing specific is jumping
 6   out at me.
 7         Q.    At some point do you remember
 8   anything specific?
 9         A.    At some point I remember two
10   cops bringing Trevor Perez, a witness to me
11   and saying that we are bringing two guys
12   that we interviewed into the precinct and
13   saying that they were -- I don't remember
14   the time frame of which is which, whether
15   Trevor Perez came first or the cops brought
16   the two witnesses first.
17               But I was told that these two
18   witnesses were pointed out by the super as
19   being friends of the shooter and them being
20   with the shooter prior -- no, being friends
21   with the shooter.  That is it.
22         Q.    Just being friends with the
23   shooter?
24         A.    Just being friends with the
25   shooter, these two guys.
```

```
 1                      D. FREED
 2          Q.    We will get into Trevor Perez.
 3    Do you remember the interview with Trevor
 4    Perez?
 5          A.    Yeah.
 6          Q.    Was he free to leave?
 7          A.    Oh, yeah, a hundred percent.
 8          Q.    Do you think he knew that?
 9          A.    Trevor Perez was forthcoming.
10    Trevor Perez had a motive.  He wanted those
11    kids away from the building.  He did not
12    want them there.  He did not want them
13    selling drugs there.  He approached the
14    cops.  He initiated the police contact.
15          Q.    That is what you heard from the
16    cops or from him?
17          A.    I heard the whole drug thing
18    from him and the cops told me that we were
19    approached by the super.
20          Q.    Did you ever document any of
21    that information?
22          A.    No.
23          Q.    Why not?
24          A.    Because Trevor Perez was in
25    fear for his life and he was trying to do
```

```
 1                      D. FREED
 2   the right thing in keeping himself safe.
 3          Q.     In putting the photo which is
 4   New York City 187, I'm showing you that now
 5   that is the copy that Trevor Perez signed?
 6          A.     Yes.
 7          Q.     That is his handwriting?
 8          A.     Yes.
 9          Q.     You put that in your detective
10   file?
11          A.     Yes.
12          Q.     Did you give it to Lou
13   Lieberman or whoever was bringing the case?
14          A.     Sure.
15          Q.     And you disclosed it to the
16   DA's office?
17          A.     I also disclosed to Lou
18   Lieberman that we have to protect this guy.
19          Q.     By having his name in the
20   paperwork that would be turned over to the
21   defense counsel in the criminal case and
22   having this document, how would not doing a
23   DD5 help protect his safety or his
24   confidentiality?
25                 MS. JOYCE:  Objection.  This
```

                              D.  FREED

 1
 2              witness would have no idea what
 3              paperwork would be turned over to the
 4              defense counsel.
 5         Q.    Is there any paperwork that you
 6    create in your arrest in your investigation
 7    potentially would get turned over to the
 8    defendant?
 9         A.    Yes.
10         Q.    Do you know if is that is
11    called Rosario material?
12         A.    Yes.
13         Q.    So you do know that.  By
14    putting this in the file Trevor Perez's
15    name was going to be out there, correct?
16         A.    Correct.
17         Q.    In fact his statement
18    identifying Shane Rhooms would be out
19    there?
20         A.    That is correct.
21         Q.    What was the reason for not
22    doing a DD5 which would have just
23    documented who was present when he gave the
24    statement and maybe some other details?
25         A.    Honestly, I did what I thought

```
 1                       D. FREED
 2    would be the bare minimum, that would be
 3    intrusive to Trevor Perez.
 4               I dealt with many defense
 5    attorneys over the year and some of them
 6    are not as sharp as the other ones and
 7    perhaps just that photo or that piece of
 8    paper or in the case folder might get
 9    overlooked if the defense attorney was just
10    going through DD5s.
11               So, I felt it was the less
12    intrusive of what needed to be done at the
13    time.
14         Q.    The signed statement of the
15    witness --
16         A.    You are asking me the question
17    and I'm telling you what my answer is, what
18    my thought was.
19         Q.    The DD5 would have identified
20    you or anyone else present during the
21    interview, correct, so that is in essence
22    what you left out of the file, correct?
23               MS. JOYCE:  Objection.
24         Q.    You didn't leave Trevor Perez's
25    statement out of the file, you just left --
```

                        D. FREED

1

2       A.    You asked me a question, I'm

3  telling you why I did what I did.

4       Q.    I'm asking a different

5  question.

6              What would have been in the DD5

7  had you had done it?

8       A.    It would have went something

9  along the lines on this date, at this time,

10  I was present here with this witness here

11  who identified and that statement would be

12  in the DD5 and that would be it.

13      Q.    By not doing the DD5, but by

14  turning in this statement, all you left out

15  was that this involved you, the undersigned

16  or whoever else was present?

17      A.    Again --

18      Q.    Would you agree with that?

19      A.    I would agree with that, yes.

20      Q.    What else would have been in

21  the DD5 other than who was present from the

22  department and a summary of the statement

23  that you actually turned over?

24      A.    That would be it.

25      Q.    So, is it possible that you

1                    D. FREED

2    prepared a DD5 for this, but it didn't

3    become part of the file?

4         A.    No.

5         Q.    How would the decision to not

6    do a DD5 protect anyone other than yourself

7    or whoever was in the room?

8              MS. JOYCE:  Objection.  It has

9          been asked and answered.

10             MR. KLEIN:  I never asked that

11         question.

12        A.    There was nothing to protect

13   myself because I'm present for the

14   identification.

15        Q.    But there is no mention of you

16   being present in the file?

17        A.    As far as protecting Trevor

18   Perez when I did confer with Lou Liberman,

19   I explained to him the situation, what we

20   had, what our intentions were and he agreed

21   that we would not need Trevor Perez.

22        Q.    A different question.

23        A.    To show probable cause.

24        Q.    A different question.

25             We can read it back if you

```
 1                    D. FREED
 2   want, but the question was simple.
 3                How did the decision not to
 4   make a DD5 protect anyone other than
 5   yourself or who was present in the
 6   interview?
 7        A.    Again, it did not protect me.
 8   The decision not to do the DD5 was not to
 9   generate additional paperwork and perhaps
10   from a less sharp defense attorney which I
11   have come across over the years, with there
12   not being a DD5 there for him to refer to,
13   might overlook that piece of paper.
14   Nothing about protecting myself.
15        Q.    I'm not saying that is what you
16   wanted to know.  I'm just asking who it
17   would have protected other than you.
18                There is no reference to your
19   name being attached to this interview in
20   the file.  So, the lack of a DD5 keeps your
21   name out of this interview?
22        A.    To what extent?
23        Q.    Just in general.  The fact that
24   the interview is part of the file, correct?
25        A.    Yes.
```

```
 1                    D. FREED
 2        Q.    So, the only thing accomplished
 3   by the lack of the DD5 is that your name is
 4   attached to it, would you agree?
 5        A.    I don't agree with that
 6   statement.  I explained to you why it was
 7   done like it was done and that's what it
 8   is.
 9        Q.    But for a DD5, your name would
10   not have been attached to this interview in
11   this file, would you agree?
12        A.    One more time.
13        Q.    Unless you had done a DD5 which
14   you didn't, that would be the only
15   connection in this file between your name
16   and this interview?
17             MS. JOYCE:  Objection.  Are you
18        limiting to the file or that he told
19        Lieberman?
20        A.    I don't understand.
21        Q.    The DD5 would be the only
22   paperwork connecting you to this interview
23   in your entire folder had you prepared one,
24   correct?
25        A.    Correct.  And again the whole
```

```
 1                      D. FREED
 2   idea was that there was not an interview.
 3   And that Trevor Perez's name was kept away
 4   from, his name being out of the situation.
 5        Q.    Why was New York City 187, the
 6   statement with the photo, why was that put
 7   in the file?
 8             MS. JOYCE:  Objection.  Asked
 9         and answered.
10        A.    Because that was us confirming
11   that Shane Rhooms, that the name that we
12   came up with through computer checks and
13   the person that is identified by the two
14   witnesses as being their friends, was the
15   same person that we are talking about.
16        Q.    How is that consistent of there
17   being no interview with Trevor Perez?
18             MS. JOYCE:  Objection.
19        Q.    You are saying that without
20   having a DD5 is down playing that he was
21   interviewed?
22        A.    Minimizing.
23        Q.    How we putting that statement
24   minimizing?
25             MS. JOYCE:  That has been asked
```

```
 1                    D. FREED
 2       A.    Right.
 3       Q.    Aren't, especially in a big
 4  case like this, when there is a lot of
 5  DD5s, a lot of witnesses, if you don't
 6  write it down, how are you able to be able
 7  to use the information?
 8             Don't you have to write down
 9  the information that you get in the DD5s?
10       A.    Not every piece of information
11  and every statistic is relevant and needs
12  to be documented.
13             Like I said, I believe that we
14  came across Shane Rhooms because the other
15  witness had named the name Shane and then a
16  computer inquiry with regard to an arrest
17  at 222 Lenox and the surrounding buildings
18  came up with the name Shane Rhooms.
19       Q.    They didn't mention Shane
20  Rhooms, they just mentioned the name Shane?
21       A.    Yes.
22       Q.    You think that is when the
23  other individual, Jason Brown, the name
24  came up?
25       A.    I'm sorry?
```

                              D. FREED

1

2        Q.    You think the name Shane came

3   up from the other interview?

4        A.    I believe so.

5        Q.    Is that Shane Brown, New York

6   City 210.

7              Did you ask Jason Brown of the

8   last name of the Shane that he was talking

9   about?

10        A.    Yes.

11        Q.    Did he tell you where Shane

12   lives?

13        A.    No.

14        Q.    Did he tell you another last

15   name?

16        A.    He told me Biggy, Courtney,

17   Shane and some girls.

18        Q.    You are looking at the DD5s

19   now.  Let's move on, but I'm asking you if

20   you remember having a conversation with him

21   about the last name of the Shane that he

22   was talking about?

23        A.    No.

24        Q.    You don't know if he was

25   talking about another Shane other than

```
 1                     D. FREED
 2   Shane Rhooms?
 3        A.    Right.
 4        Q.    To this date you don't know?
 5        A.    Right.
 6        Q.    You had a question about that,
 7   didn't you, during the investigation?
 8        A.    What is that?
 9        Q.    Whether the Shane that Jason
10   mentioned was Shane Rhooms.
11              MS. JOYCE:  Objection.
12              You can answer.
13        A.    I had a question with --
14        Q.    During the investigation you
15   got the name Shane only from Jason Brown;
16   is that correct?
17        A.    Right.
18        Q.    You didn't get a name Jason
19   Rhooms?
20        A.    Correct.
21        Q.    That is where this mug shot
22   came from, it was like a fireworks arrest
23   when he was ACD?
24        A.    I don't know.
25        Q.    So, did you ever go back to
```

```
1                         D. FREED
2      Jason Brown and say is this the Shane,
3      showing him the picture?
4           A.    Yes.
5           Q.    Did he say it wasn't?
6           A.    He said that's my man Shane.
7           Q.    He said that's who he was with
8      earlier in the day?
9           A.    Right.
10          Q.    He didn't say that was the guy
11     who was at the scene of the shooting, he
12     said earlier in the day, correct?
13          A.    Right.  Neither one of those
14     guys said that he had seen or were there or
15     saw who did the shooting.
16          Q.    But at that point you didn't
17     know that was the Shane he was talking
18     about as being, that he was with that
19     evening?  He said he was with a Shane that
20     evening?
21          A.    He said he was with a Shane
22     earlier.  Is that the Shane you were with
23     earlier, yes.
24          Q.    Did you inquire how much
25     earlier, if it was earlier that afternoon
```

```
 1                        D. FREED
 2   versus earlier that evening?
 3        A.    No.
 4        Q.    If he had told you that early
 5   in the day and not early that evening,
 6   would you have inquired if there was
 7   another Shane, if there was more than one
 8   Shane?
 9             MS. JOYCE:  Objection.
10             You can answer.
11        A.    I don't know.  No, probably
12   not.
13        Q.    After interviewing Jason Brown
14   and showing him the photo, you have no
15   reason to believe Shane Rhooms was involved
16   in the shooting based on that interview?
17        A.    Correct.
18        Q.    You just knew that he was with
19   a Shane earlier that day?
20        A.    Correct.
21        Q.    You don't know what time he was
22   with Shane?
23        A.    I came to the conclusion that
24   this person Shane was friends with these
25   two guys.  That was my conclusion then.
```

```
 1

 2    UNITED STATES DISTRICT COURT
      EASTERN DISTRICT OF NEW YORK
 3    ----------------------------------------X
      SHANE RHOOMS,
 4
                              PLAINTIFF,
 5          -against-          Case No.:
                              11 CV 05910
 6                            (JG)(RER)
      CITY OF NEW YORK, ROBERT ORTLIEB,
 7    individually, ROBERT HENDERSON,
      individually, JOSEPH SEMINARA,
 8    individually, DEVON FREED, individually and
      JOHN and JANE DOE 1 through 10,
 9    individually, (the names John and Jane Doe
      being fictitious, as the true names are
10    presently unknown),

11                            DEFENDANTS.
      ----------------------------------------X
12    UNITED STATES DISTRICT COURT
      EASTERN DISTRICT OF NEW YORK
13    ----------------------------------------X
      SHANE RHOOMS,
14
                              PLAINTIFF,
15          -against-          CASE NO:
                              13 CV 5006
16                            (PKC)(RER)
      MICHAEL ENRIGHT, individually, FRANK
17    SCIORITINO, individually, MATTHEW WALKER,
      individually, GREGORY BARRETT,
18    individually, FRANCIS KIERNAN,
      individually, ADAM WRIGHT, individually,
19    MICHAEL LEAVER, individually, DINO ANSELMO,
      individually, KENNETH FUNG, individually,
20    STEVEN XUEREB, individually,
                              DEFENDANTS.
21    ----------------------------------------X

22                      DATE:  February 18, 2015

23                      TIME:  9:40 A.M.

24

25    (DEPOSITION OF DEVON FREED.)
```

```
 1                      D. FREED
 2              MS. JOYCE:  Objection.
 3              You can answer.
 4         A.   I would say it was likely that
 5    someone else filled in.
 6         Q.   And given how much activity was
 7    going on that night, do you have any way of
 8    remembering who that would be?
 9         A.   No.
10         Q.   Sitting here today, you're not
11    sure if Greg was in on it, you just
12    typically worked with Greg, if you could?
13         A.   That is correct.
14         Q.   So, if there was someone else
15    you don't know if it was someone else from
16    some other precinct or from the 67th?
17         A.   What I can say is this, if it
18    was someone else it was definitely not
19    anybody from an outside command.  I could
20    say that for sure.
21         Q.   What would you base that on?
22         A.   For the fact I wouldn't be
23    sitting in on an interview with somebody
24    that I didn't know.
25         Q.   Were you present when Trevor
```

```
 1                    D. FREED
 2   Perez wrote the handwritten statement on
 3   that mugshot photo?
 4        A.    Yes.
 5        Q.    And someone else may have been
 6   present, you just don't remember?
 7        A.    That is correct.
 8             MR. KLEIN:  Off the record.
 9             (Whereupon, a discussion was
10         held off the record.)
11             MR. KLEIN:  Back on the record.
12        Q.    Since your last deposition,
13   have you spoken with Lou Liberman at all?
14        A.    No.
15        Q.    Have you heard or read his
16   testimony?
17        A.    No.
18        Q.    Have you become aware of his
19   testimony in this case?
20        A.    I'm aware that he had
21   testified.  I'm not aware what it was.
22        Q.    Back in September of 2010, if
23   you had gone out to a crime scene and then
24   drove back to the command, did you have a
25   personal practice that you would be the
```

```
1                         D. FREED
2      Rhooms when Hopeton Clark was interviewed
3      at 4:00 a.m.?
4           A.    I can't say that that time is
5      accurate.
6           Q.    Can you say it is inaccurate?
7           A.    I can't say.  I seem to think
8      in my mind that we interviewed him earlier
9      than 4:00 in the morning.
10          Q.    But you are not sure?
11          A.    I'm not sure.
12          Q.    When you say we, you believe
13     you were part of that interview?
14          A.    I believe I was.
15          Q.    Do you remember anything else
16     about Hopeton Clark, what he looked like,
17     his demeanor?
18          A.    No.
19          Q.    Do you remember his demeanor?
20          A.    I remember that he certainly
21     was not forthcoming with any information.
22          Q.    But this DD5, does this reflect
23     the entirety of the relevant information
24     that you got from him?
25          A.    Yes.
```

1                       D. FREED

2          Q.     So, he never made a connection

3    to Shane Rhooms, if he did it would have

4    been written in this report, correct?

5          A.     I can't say what Greg decided

6    to put in or not put into that report.  I

7    know at some point after interviewing

8    Hopeton Clark and Brown that we had the

9    name Shane.

10         Q.     But assuming Greg was accurate

11   in his report and made a decision what to

12   put in was relevant, this suggests that he

13   didn't, you never got the name Shane from

14   Hopeton Clark?

15         A.     That is what that report

16   suggests, yes.

17         Q.     Why would Greg make a

18   determination not to put in?

19         A.     I can't speak for Greg.  I'm

20   saying that I can't speak for Greg.

21         Q.     As to what he put in or didn't

22   put in the report?

23         A.     Right.

24         Q.     But you are not aware of him

25   keeping certain information out of the

```
 1                     D. FREED
 2   report?
 3          A.    No, I'm not.  Actually I would
 4   like to rephrase that question.
 5                In all the years that I spoke
 6   to Greg, that I worked with Greg, I would
 7   never know him to leave something relevant
 8   out of the report.  He is a competent
 9   investigator.
10          Q.    Based on this report, in the
11   interview of Hopeton Clark, didn't lead to
12   anything about Shane Rhooms?
13          A.    Based on that report, yes.
14          Q.    Is there any other meeting or
15   interview with Hopeton Clark that you know
16   of that did lead to such information?
17          A.    I don't know.
18          Q.    This is not in writing you
19   don't remember it?
20          A.    No.
21          Q.    Page New York City 4125 is a
22   photocopy of Hopeton Clark's license and
23   Jason Brown's license, do you see that?
24          A.    Okay.
25          Q.    Do you know who would have
```

```
 1                    D. FREED
 2    or was it the second time?
 3          A.    The first time.
 4          Q.    Looking at the Jason Brown
 5    interview, he is the individual according
 6    to the DD5, he said that he was with Big,
 7    Courtney, Shane and some girls; is that
 8    right?
 9          A.    Yes.
10          Q.    That is where you got the name
11    Shane from?
12          A.    Yeah.
13          Q.    Jason Brown never implicated
14    him in the shooting, correct?
15          A.    Correct.
16          Q.    At that point that Jason Brown
17    gave you the name Shane, you were able to
18    through background checks or name searches
19    come up with a name Shane Rhooms?
20          A.    Yes.
21          Q.    And then Jason Brown confirmed
22    I know that is Shane Rhooms?
23          A.    Right.
24          Q.    And from there you prepared the
25    wanted poster, correct?
```

                              D. FREED

1

2          A.    At some point after that.

3          Q.    Well, look at the next DD5.

4     Take a look at page New York City 211 is

5     the page after New York City 210.

6          A.    I think I testified to this

7     earlier.  That the order of the DD5s might

8     not necessarily be the direct chronological

9     order.

10         Q.    But they also might be?

11         A.    Yeah.

12         Q.    You don't know either way?

13         A.    Right.

14         Q.    And once you got the photo, you

15    did the photo I.D. with Sergeant Seminara,

16    correct?

17         A.    At some point, yeah.

18         Q.    You remember that being around

19    5:00 a.m.?

20         A.    I'm not sure.

21         Q.    Look at page New York City 227.

22    Does that show at 4:40 a.m. you constructed

23    the photo array?

24         A.    Yes.

25         Q.    Barrett actually wrote this,

1                     D. FREED
2      but do you believe you worked on it the
3      photo array with Barrett?
4          A.    No.
5          Q.    You think he did it at your
6      request?
7          A.    Yes.
8          Q.    You were supervising Barrett
9      and definitely involved in the construction
10     of the photo array in terms of authorizing
11     it, but he actually, physically did it, is
12     that fair to say?
13              He wouldn't have done it
14     without you saying go ahead and do it?
15         A.    Yes, that is correct.
16         Q.    Assuming the interviews of
17     Brown and Clark were around 4:00 and Trevor
18     Perez's photo was signed at 4:30, is it
19     fair to say that it was that I.D. by Trevor
20     Perez that allowed you to construct the
21     photo array which was shown to Seminara?
22         A.    Yes.
23         Q.    Without Trevor Perez
24     identifying Shane Rhooms as the person
25     involved in the shooting, did you have any

```
 1                       D. FREED
 2    basis to link Shane Rhooms to the shooting
 3    at that point?
 4               MS. JOYCE:  Objection.
 5               You can answer.
 6        A.    Just repeat it.
 7               MR. KLEIN:  Read it back.
 8               (Whereupon, the referred to
 9          question was read back by the
10          Reporter.)
11        A.    Without Trevor Perez, no.
12        Q.    And you had no basis to
13    construct a photo array of possible
14    suspects unless Trevor Perez had given you
15    an I.D., correct?
16        A.    Correct.
17        Q.    Do you recall that was shortly
18    after 4:40 when the photo array was
19    constructed at around 5:00 a.m. that
20    Seminara came in and made the I.D.?
21        A.    It seems likely.  I would have
22    to see it.
23        Q.    Look at page 223, New York City
24    page 223.
25               Does that confirm that
```

```
 1                    D. FREED
 2   means someone that has been used before for
 3   information and brought before a judge to
 4   be certified as reliable?
 5        A.    Correct.
 6        Q.    Would you have ever called
 7   Trevor Perez a CI to Lou Liberman?
 8        A.    No.
 9        Q.    If you portrayed Trevor Perez
10   to Lou Liberman as a CI, would that have
11   been misleading?
12        A.    Yes.
13        Q.    If you obtained the statement
14   from Trevor Perez, New York City 187, the
15   document, the signed statement from Trevor.
16        A.    Right.
17        Q.    And did not give it to Lou
18   Liberman or tell him that you had such a
19   statement, would that have been misleading?
20             MS. JOYCE:  Objection.
21             You can answer it.
22        A.    Sure, because we would have
23   never been able to be in the position to
24   put Shane Rhooms in a photo array for
25   Seminara to view and then proceed forward
```

1                    D. FREED
2      from there.
3           Q.     When do you remember giving the
4      statement that, the Trevor Perez signed
5      statement to Lou Liberman?
6                  Was it when you met with him
7      for the grand jury?  Your grand jury
8      testimony was on September 8th, two days
9      after the arrest.
10                 Did you meet with Lou Liberman
11     at least once or twice before your grand
12     jury?
13          A.     Yes.
14          Q.     Did you provide your paperwork
15     that was done at that point to him?
16          A.     Yes.
17          Q.     Is that when you would have
18     given him the Trevor Perez photo?
19          A.     Yes.
20          Q.     It's your testimony that you
21     gave it to him before the grand jury?
22          A.     Yes.
23          Q.     The second Trevor Perez
24     interview when he signed the statement, do
25     you know how long that interview lasted?