UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------x
SHANE RHOOMS,

                          Plaintiff,

          -against-                                    **MEMORANDUM & ORDER**

                                                       11-CV-5910 (PKC) (RER)

CITY OF NEW YORK, ROBERT ORTLIEB,
Individually, ROBERT HENDERSON,
Individually, JOSEPH SEMINARA,
Individually, DEVON FREED, Individually,
and JOHN DOE 1, Individually, (the name John
Doe being fictitious, as the true name is
presently unknown),

                          Defendants.
-------------------------------------------------------x

PAMELA K. CHEN, United States District Judge:

      Plaintiff Shane Rhooms filed this action pursuant to 42 U.S.C. § 1983 and New York

common law to seek damages based on his arrest, detention, and prosecution in September 2010.

Rhooms alleges that one detective and three field officers of the New York Police Department

("NYPD")—Detective Devon Freed, Sergeant Joseph Seminara, Lieutenant Robert Henderson,

and Lieutenant Robert Ortlieb ("Individual Defendants")—violated his civil rights by arresting

him, detaining him, and maliciously prosecuting him without probable cause.  Rhooms also alleges

that the City of New York ("City") is vicariously liable for the Individual Defendants' misconduct.

      Before the Court is Defendants' motion for summary judgment pursuant to

Fed. R. Civ. P. 56.  The Court DENIES Defendants' motion in its entirety, except as to Plaintiff's

failure to intervene claim, which he has withdrawn in response to Defendants' motion.  The parties

shall submit a proposed joint pretrial order no later than May 15, 2017.

## I. Background

### A. Relevant Facts[1]

On September 5, 2010, Rhooms, his cousin, and some friends went to a Manhattan nightclub, arriving at the club sometime around midnight. (Pl. 56.1 ¶ 1.) Rhooms was continuously present at the club from approximately midnight until 5:00 a.m. on September 6, 2010. (Pl. 56.1 ¶ 2.)

Meanwhile, at approximately 12:40 a.m. that night, four officers of the NYPD—Defendants Henderson, Seminara, and Ortlieb ("Officer Defendants"), and a fourth officer not named as a defendant—were on patrol in a police vehicle in the vicinity of 222 Lenox Road in Brooklyn. (Def. 56.1 ¶ 4; Pl. 56.1 ¶ 3.) Henderson was seated in the front passenger seat of the vehicle, Seminara was seated in the rear passenger-side seat of the vehicle, Ortlieb was seated in the rear driver's-side seat of the vehicle, and the fourth non-defendant officer was driving the vehicle. (Pl. 56.1 ¶¶ 5, 11, 18.) The vehicle was traveling at approximately 10 miles per hour down Lenox Road when Henderson's attention was drawn by the smell of marijuana to a group of individuals standing close to an alley near 222 Lenox Road. (Def. 56.1 ¶ 7; Pl. 56.1 ¶ 5.) Henderson testified that the group consisted of three men and a woman (Def. 56.1, Ex. G, at 122:20-24); Ortlieb testified that the group consisted of four men (Pl. 56.1, Ex. 3, at 116:15-

---

[1] The facts stated in this section are taken from the parties' Local Rule 56.1 submissions and the record evidence cited therein. (*See* Dkt. 75 (Defendants' 56.1 Statement ("Def. 56.1")); Dkt. 79 (Plaintiff's 56.1 Statement ("Pl. 56.1")).) Where a party's Rule 56.1 Statement is cited and there is no contrary evidence in the record, the Court deems that fact to be undisputed and admitted. Unless otherwise noted, a standalone citation to a 56.1 Statement denotes that the Court has deemed the underlying factual allegation undisputed. Any citation to a party's Rule 56.1 Statement incorporates by reference the documents cited therein unless otherwise noted. Where relevant, however, the Court may cite directly to the underlying document.

117:3); and Seminara testified that the group consisted of some number of individuals "in the realm of one, two, three, four, five, however many there were" (Pl. 56.1, Ex. 4, at 149:6-14).

As the Officer Defendants' vehicle approached the group, one of the men adjusted his waistband and stepped behind the group, shielding his face from the officers' view. (Pl. 56.1 ¶ 6.) According to the Officer Defendants, the man adjusted his waistband in a manner that suggested he was carrying a knife or firearm. (Def. 56.1, Ex. G, at 128:12-25.) After adjusting his waistband, the man stepped forward again, facing the officers. (Pl. 56.1, Ex. 4, at 145:13-22.) In the span of this few seconds, while the officers' vehicle was still moving, each Officer Defendant had a brief opportunity to view the man's face in the dim lighting of a nearby street lamp.[2] The driver then stopped the vehicle, and Officer Henderson exited, stating in substance, "police, hold up." (Def. 56.1 ¶ 9.)

As Henderson exited the vehicle, the man who had adjusted his waistband turned away and began running down an alleyway, with his back towards the officers. (Def. 56.1 ¶¶ 9-10; Pl. 56.1 ¶ 8.) Defendants Henderson, Seminara, and Ortlieb, in that order, pursued the man down the alleyway. (Pl. 56.1 ¶ 26.) In the course of that pursuit, the three officers fired a total of nineteen rounds at the man as he fled. (Pl. 56.1 ¶ 35.) According to the officers, they fired because, as the man was running away, he pulled out a black revolver and fired six rounds in their direction, some of which hit the alley walls around them. (Def. 56.1 ¶ 10; Pl. 56.1 ¶¶ 27-36.) The pursuit ended

---

[2] From the front passenger seat of the vehicle, Henderson got only a very quick look at the individual's face, which was not conclusive and lasted only a few seconds. (Pl. 56.1 ¶ 7.) From the rear passenger-side of the vehicle, Seminara had about five seconds to observe the individual's face. (Pl. 56.1 ¶ 15.) From the rear driver's-side of the vehicle, Ortlieb had a few seconds to observe the individuals while he was ducked behind three other members of the group. (Pl. 56.1, Ex. 3, at 131:4-133:8.) The area where the group of individuals was standing was dark and poorly lit. (Pl. 56.1 ¶ 23.)

when the man entered a nearby building and the officers did not follow him in.  (Def. 56.1 ¶ 11; Pl. 56.1 ¶ 31.)

Shortly after the incident, officers in the NYPD Crime Scene Unit conducted a thorough search of the crime scene.  (Pl. 56.1 ¶ 37.)  The search revealed nineteen shell casings and bullet fragments, all of which were consistent with the Officer Defendants' firearms.  (Pl. 56.1 ¶ 37.) The search did not uncover any other bullet casings or fragments at the scene—in other words, the search did not uncover any casings or fragments corresponding to the six shots that were purportedly fired at the officers by the man they were pursuing.  (Pl. 56.1 ¶¶ 37-38.)  Other than the deposition testimony and other statements by Officers Henderson, Seminara, and Ortlieb, Defendants do not identify any record evidence indicating that the man whom the officers pursued at 222 Lenox Street fired at them.

After the incident, the Officer Defendants were unable to provide a detailed description of the man they had pursued.  The most detailed description provided by the three officers was from Ortlieb, who could only describe the man as a black male wearing dark clothing.  (Pl. 56.1 ¶¶ 40-42.)

Within an hour of the incident, Defendant Freed was assigned as the lead investigator for the incident.  (Pl. 56.1 ¶ 44.)  Freed examined the scene and interviewed witnesses who were in the vicinity of 222 Lenox Street at the time of the incident.  (Pl. 56.1 ¶¶ 45-46.)  In the hours after the incident, Freed interviewed approximately ten witnesses, in addition to the Officer Defendants. (Def. 56.1, Ex. M.)

None of the interviewed witnesses identified Plaintiff Rhooms as the person who fled from the police at 222 Lenox Street.  (Pl. 56.1 ¶ 57.)  The only link between the incident and Rhooms was that:  (1) in an interview with non-defendant Detective Gregory Barrett within a few hours

after the incident, a witness named Hopeton Clarke said that he'd been hanging out earlier in the day near 222 Lenox Street with someone named Jason Brown (Def. 56.1 ¶ 23; Def. 56.1, Ex. M, at NYC_209); and (2) in a later interview that night with Defendant Freed, Jason Brown stated that he had been hanging out with someone named "Shane" "earlier in the day" (Pl. 56.1 ¶ 57; *see also* Pl. 56.1, Ex. 6, at 154:13-20). Brown did not tell Detective Freed how much "earlier in the day" he had hung out with "Shane," nor did he tell Freed where the two had hung out. (Pl. 56.1, Ex. 6, at 153:13-154:25.) What was clear, however, is that Brown said nothing to indicate that the "Shane" he had seen "earlier in the day" was the man whom the police pursued at 222 Lenox Street. (Pl. 56.1, Ex. 6, at 154:13-20.) Based on Brown's statements, Defendant Freed ran a search of police records for any "Shane" associated with the area around 222 Lenox Street. (Def. 56.1 ¶ 25.) The search yielded a record for Plaintiff Rhooms associated with a prior arrest, which contained an arrest photo of Rhooms. (Def. 56.1 ¶ 25.) Freed showed the photograph to Brown, who stated that the man depicted in the photograph was the "Shane" with whom he had been hanging out "earlier in the day." (Def. 56.1 ¶ 29.)

After interviewing Brown, Detective Freed interviewed Trevor Perez, a resident of 222 Lenox Road who was in the vicinity of his residence when the shooting incident occurred. (Def. 56.1 ¶¶ 31-32.) Perez knew Rhooms and knew that Rhooms was not in the vicinity of 222 Lenox Street at the time of the shooting. (Def. 56.1 ¶ 31.) During the interview, which took place in the early morning of September 6 in the presence of at least one other police officer, Freed took unlawful, coercive actions to force Perez into signing a false statement identifying Rhooms as the man who fled from the Officer Defendants at 222 Lenox Street. (Def. 56.1 ¶ 31.) The coercive actions included holding Perez handcuffed on the ground for an extended period of time, keeping Perez in an interrogation room, interrogating Perez in loud and aggressive tones, touching Perez

in a threatening and intimidating manner, and denying Perez food and drink. (Pl. 56.1 ¶¶ 48-49.) Perez was shown a *single* photograph—the arrest photo of Plaintiff Rhooms that had been shown to Jason Brown—and was told that he would not be allowed to leave the police precinct until he identified the man in the arrest photo as the shooter at 222 Lenox Street. (Pl. 56.1 ¶¶ 51-53.) Feeling threatened and without any reasonable alternatives, Perez wrote and signed the following statement on Plaintiff Rhooms's arrest photo: "This is the guy that I saw running from the cops with the gun. Dress [sic] in all black." (Def. 56.1, Ex. N.)

After coercing Perez to falsely identify Rhooms, Defendant Freed asked Detective Barrett to construct a six-photo array that included Rhooms's arrest photo. (Pl. 56.1 ¶ 60; Def. 56.1 ¶ 39.) Had Perez not been coerced into implicating Rhooms, there would have been no basis to construct a photo array that contained Rhooms's photograph. (Pl. 56.1 ¶ 61.) Freed showed the photo array to Defendant Seminara at approximately 5:00 a.m. that same morning, September 6, 2010. (Pl. 56.1 ¶ 62.) There were no other officers present when Freed showed the photo array to Seminara. (*Id.*) Defendant Seminara picked Rhooms's photograph out of the lineup, identifying him as the man who fled from the Officer Defendants at 222 Lenox Street. (Pl. 56.1 ¶ 65.)

Later that morning, based purportedly on the photo array identification, Detective Freed prepared a "wanted" poster with Rhooms's arrest photo displayed prominently in the center. (Pl. 56.1 ¶ 66; Pl. 56.1, Ex. 27.) Above the photograph, in large lettering, the poster stated, "WANTED FOR Attempted Murder of a POLICE OFFICER." (Pl. 56.1, Ex. 27.) Beneath the photograph, the poster stated, "On 09/06/2010 at approximately 0030 hours at 222 Lenox Road Shane Rhooms did exchange gunfire with uniformed members of the service who were attempting to stop him. Above perpetrator is known to be armed and dangerous." (Pl. 56.1, Ex. 27.) The poster was displayed in the police precinct later that morning, *i.e.*, the morning of September 6, 2010, and

Defendants Ortlieb, Henderson, and Seminara all had access to the area where it was displayed. (Pl. 56.1 ¶ 70.)  Officer Henderson saw the poster on September 6, 2010.  (Pl. 56.1 ¶ 69.)

Later in the day on September 6, 2010, Plaintiff Rhooms learned through a third party that he was wanted for questioning by the police.  (Def. 56.1 ¶ 46.)  At around 6:00 p.m. that day, Rhooms reported voluntarily to the NYPD's 67th precinct, where he was arrested.  (Pl. 56.1 ¶ 72.) Rhooms's cousin had accompanied Rhooms to the precinct to verify that Rhooms had been at a Manhattan nightclub during the 222 Lenox Street incident in Brooklyn, and, therefore, could not possibly be the man who fled from the Officer Defendants the night before.  (Pl. 56.1 ¶ 71.)  The police questioned Rhooms and his cousin separately, and both Rhooms and his cousin gave consistent accounts of Rhooms's whereabouts the night before.  (Pl. 56.1 ¶ 76.)  Plaintiff also informed the detectives who questioned him (including Detective Freed) that the nightclub in question had surveillance cameras that would confirm Plaintiff's whereabouts the night before. (Pl. 56.1 ¶ 77.)  Rhooms also turned over his subway pass and cellphone to the police.  (Pl. 56.1 ¶¶ 77-79.)  The detectives, including Defendant Freed, did not obtain security footage from the nightclub, did not examine Rhooms's subway travel history, and did not examine the location history of Rhooms's cellphone.  (Pl. 56.1 ¶¶ 79-81.)

The next day, September 7, 2010, Rhooms was placed in three identification lineups, one for each of the Officer Defendants.  (Def. 56.1 ¶ 47.)  Before the lineups, Rhooms was asked which position in the lineup he wanted, and he selected the third position.  (Def. 56.1 ¶ 48.)  Rhooms was the only man in the lineup wearing dark pants.  (Pl. 56.1 ¶ 83; Def. 56.1, Ex. M, at 4085-4087.)  In succession, Defendants Henderson, Ortlieb, and Seminara each positively identified Rhooms as the man who fled from them at 222 Lenox Street.  (Def. 56.1 ¶ 47.)  The identifications occurred

within minutes of one another, all in the same identification room, without rearranging the men in the lineup.  (Def. 56.1 ¶¶ 47-48.)

Later that day, a criminal court complaint was issued by the Kings County District Attorney's Office based on information provided to that office by Defendant Ortlieb.  (Def. 56.1 ¶ 49.)  Defendants Henderson, Seminara, and Freed also provided information to the District Attorney's Office that played a role in its decision to prosecute Rhooms.  (Pl. 56.1 ¶¶ 97-99.)  In particular, Defendant Freed falsely told the prosecutor assigned to the case that a confidential informant had identified Rhooms as the shooter at 222 Lenox Street.  (Pl. 56.1 ¶ 101.)  None of the Defendants told the District Attorney's Office about Freed's coercion of Perez, or the fact that a "wanted" poster was posted before the lineup identifications by Defendants Henderson, Seminara, and Ortlieb.

Later that week, Rhooms was indicted on twenty criminal counts, including multiple counts of attempted murder in the first degree.  (Def. 56.1 ¶ 50.)  Defendants Freed, Henderson, and Seminara all testified before the grand jury in the course of obtaining the indictment.  (Def. 56.1 ¶¶ 50-53.)  After the indictment was returned by the grand jury, Rhooms was formally arrested and arraigned, and then imprisoned at the Rikers Island Prison Complex ("Rikers Island").  (Pl. 56.1 ¶ 94.)  Plaintiff was subject to handcuffing during the arrest.  (Pl. 56.1 ¶ 95.)

Weeks after Rhooms was indicted, the Assistant District Attorney ("ADA") handling Rhooms's prosecution obtained video surveillance footage from the Manhattan night club where Rhooms was during the 222 Lenox Street incident in Brooklyn.  (Def. 56.1 ¶ 54; Pl. 56.1 ¶ 106.)  The video surveillance footage confirmed that Rhooms was at the club in Manhattan at the time of the shooting.  (Pl. 56.1 ¶ 107.)  Around this time, Rhooms also submitted to a lie detector test, which indicated that he was telling the truth about his whereabouts during the 222 Lenox Street

shooting.  (Pl. 56.1 ¶ 108.)  On September 24, 2010, sometime shortly after viewing the

surveillance footage, the ADA consented to Rhooms's release from Rikers Island.  (Pl. 56.1 ¶ 109.)

The criminal charges against Rhooms were dismissed on December 21, 2010.  (Pl. 56.1 ¶ 110.)

### B.    Plaintiff's Claims

Plaintiff Rhooms commenced this action on December 2, 2011.  (Dkt. 1.)  Following

several amendments to the complaint, the operative complaint in this action is Rhooms's Second

Consolidated Amended Complaint.  (Dkt. 65.)  As to the Individual Defendants—Detective

Freed and Officers Ortlieb, Henderson, and Seminara—Rhooms asserts the following causes of

action:  (i) false arrest and unlawful imprisonment in violation of 42 U.S.C. § 1983, (ii) malicious

prosecution in violation of 42 U.S.C. § 1983, (iii) denial of a fair trial in violation of 42 U.S.C.

§ 1983, (iv) failure to intervene in violation of 42 U.S.C. § 1983, (v) false arrest under New York

law, (vi) battery under New York law, and (vii) malicious prosecution under New York law.  As

to the City, Rhooms asserts claims of false arrest, battery, and malicious prosecution under New

York law, each of which is asserted against the City on a theory of *respondeat superior*.

Defendants move for summary judgment on all of Rhooms's claims.

## II.  <u>Summary Judgment Standard</u>

Summary judgment may be granted only where there is no genuine issue as to any material

fact and the moving party is entitled to a judgment as a matter of law.  Fed. R. Civ. P. 56(c).

In ruling on a motion for summary judgment, a court must resolve all ambiguities and draw all

factual inferences in favor of the nonmoving party.  *McClellan v. Smith*, 439 F.3d 137, 144 (2d

Cir. 2006).  "To grant the motion, the court must determine that there is no genuine issue of

material fact to be tried."  *Id.* (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23 (1986)).  A

genuine factual issue exists where the "evidence is such that a reasonable jury could return a verdict

for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). The nonmoving party cannot defeat summary judgment by "simply show[ing] that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986), or by a factual argument based on "conjecture or surmise," *Bryant v. Maffucci,* 923 F.2d 979, 982 (2d Cir.1991). "[What] is required [from a nonmoving party] is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *First Nat'l Bank of Ariz. v. Cities Serv. Co.,* 391 U.S. 253, 288-89 (1968). "Credibility assessments, choices between conflicting versions of the events, and the weighing of evidence are matters for the jury, not for the court on a motion for summary judgment." *Fischl v. Armitage,* 128 F.3d 50, 55 (2d Cir. 1997).

## III. <u>Analysis</u>

Both the City and the Individual Defendants move for summary judgment on all of the claims asserted against them, *i.e.*: (1) as to the Individual Defendants, (i) false arrest and unlawful imprisonment in violation of 42 U.S.C. § 1983, (ii) malicious prosecution in violation of 42 U.S.C. § 1983, (iii) denial of a fair trial in violation of 42 U.S.C. § 1983, (iv) failure to intervene in violation of 42 U.S.C. § 1983, (v) false arrest under New York law, (vi) battery under New York law, and (vii) malicious prosecution under New York law; and (2) as to the City, claims for false arrest, battery, and malicious prosecution under New York law, each of which is asserted against the City on a theory of *respondeat superior*. The Court addresses each of Plaintiff's claims in turn.

## A. False Arrest and Unlawful Imprisonment (42 U.S.C. § 1983)

"A § 1983 claim for false arrest [or false imprisonment][3], resting on the Fourth Amendment right of an individual to be free from unreasonable seizures, including arrest without probable cause, is substantially the same as a claim for false arrest under New York law." *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996) (internal citations omitted); *see also Jenkins v. City of N.Y.*, 478 F.3d 76, 84 (2d Cir. 2007) (citing *Weyant*, 101 F.3d at 852). To prevail on a claim of false arrest or unlawful imprisonment, a plaintiff must prove that "(1) the defendant intended to confine the plaintiff, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement, and (4) the confinement was not otherwise privileged." *Savino v. City of N.Y.*, 331 F.3d 63, 75 (2d Cir. 2003) (quotation omitted). "The existence of probable cause to arrest constitutes justification and 'is a complete defense to an action for false arrest.'" *Weyant*, 101 F.3d at 852 (quotation omitted). Furthermore, to prevail on a § 1983 claim against a particular defendant, a plaintiff must demonstrate the defendant's "personal involvement" in the violation, which the Second Circuit has defined as "personal participation by one who has knowledge of the facts that rendered the conduct illegal," or indirect participation, such as "ordering or helping others to do the unlawful acts." *Provost v. City of Newburgh*, 262 F.3d 146, 155 (2d Cir. 2001).

In this case, there is no dispute that the Individual Defendants intended to confine Rhooms, that Rhooms was conscious of the confinement, and that Rhooms did not consent to the confinement. The only issues in dispute are (1) whether the confinement was privileged,

---

[3] Under New York law, false arrest and false imprisonment are "synonymous." *Posr v. Doherty*, 944 F.2d 91, 96 (2d Cir. 1991); *see also Singer v. Fulton Cnty. Sheriff*, 63 F.3d 110, 118 (2d Cir. 1995) ("The common law tort of false arrest is a species of false imprisonment.") (citing *Broughton v. New York*, 335 N.E. 2d 310, 314 (N.Y. 1975)); *Mitchell v. Home*, 377 F. Supp. 2d 361, 371 n.3 (S.D.N.Y. 2005) ("The right against false imprisonment in the criminal prosecution context extends only to pre-trial detention, rendering false arrest and false imprisonment synonymous.").

which is essentially a question of whether there was probable cause to arrest and imprison Rhooms, and (2) whether Defendants Seminara, Henderson, and Ortlieb were personally involved in the alleged false arrest and imprisonment. The Court finds that there are material facts in dispute on both issues, such that summary judgment must be denied as to Plaintiff's false arrest/imprisonment claim.

### 1. Probable Cause

Defendants assert there was probable cause to arrest Rhooms on September 6, 2010, because he was positively identified as the shooter at 222 Lenox Street by three eyewitnesses—Officer Defendants Seminara, Henderson, and Ortlieb—first in a photo array by Seminara and then in three separate identification lineups by each of the officers. (Defs.' Br. at 5-7.) Defendants further assert that probable cause to arrest Rhooms was not negated by Rhooms's and his cousin's assertions that Rhooms was at a Manhattan night club during the 222 Lenox Street incident. (Defs.' Br. at 8.)

Probable cause exists when an officer has "knowledge or reasonably trustworthy information sufficient to warrant a person of reasonable caution in the belief that an offense has been committed by the person to be arrested." *Martinez v. Simonetti,* 202 F.3d 625, 634 (2d Cir. 2000) (quotation omitted). As a general matter, the identification of a suspect by a first-hand witness is sufficient to establish probable cause to arrest, where there is no reason to question the reliability of the identification or the veracity of the witness. *See, e.g.*, *Martinez*, 202 F.3d at 634; *Wahhab v. City of N.Y.*, 386 F. Supp. 2d 277, 287 (S.D.N.Y. 2005); *see also Celestin v. City of N.Y.*, 581 F. Supp. 2d 420, 431 (E.D.N.Y. 2008) ("A positive photo identification by an eyewitness is normally sufficient to establish probable cause," except where the identification procedure is "too unreliable to establish probable cause."); *Panetta v. Crowley*, 460 F.3d 388, 395

(2d Cir. 2006) (noting that probable cause may not exist if there are doubts as to the witness's veracity).  Furthermore, as Defendants argue, where there are reliable identifications by several first-hand witnesses, probable cause would generally exist regardless of whether the suspect asserted a credible alibi.  *See, e.g.*, *Wieder v. City of N.Y.*, 569 F. App'x 28, 29 (2d Cir. 2014) ("Once a police officer has a reasonable basis for believing there is probable cause, he is not required to explore and eliminate every theoretically plausible claim of innocence before making an arrest." (quoting *Ricciuti v. N.Y.C. Transit. Auth.*, 124 F.3d 123, 128 (2d Cir. 1997))).

Applying these general principles, the probable cause determination here reduces to a single question:  were the positive identifications of Plaintiff Rhooms by first-hand witnesses Officers Seminara, Henderson, and Ortlieb sufficiently reliable "to warrant a person of reasonable caution" to conclude that Plaintiff was the man who fled from the police at 222 Lenox Street, without any further investigation or inquiry into Plaintiff's proffered alibi?  The Court finds that a genuine issue of fact exists as to whether the three Officer Defendants' identifications of Plaintiff met this standard of reliability, such that, at a minimum, further investigation should have been conducted into Rhooms's alibi before arresting him.

The Court's conclusion is based on the following circumstances, which undermine the reliability of the Individual Defendants' identifications of Rhooms as the shooter.  First, the reliability of Defendant Seminara's photographic identification of Rhooms is undercut by Seminara's prior statements to investigators and his testimony in deposition, which show that, at the time of 222 Lenox Street incident, Seminara had almost no opportunity—*i.e.*, viewing the suspect for a few seconds from inside a moving vehicle and under poor lighting conditions—to observe the suspect's face before he fled down the alleyway.  Immediately after the incident, the best description Seminara could give of the suspect was that he was a black male wearing dark

clothing.  These undisputed facts cast genuine doubt on Seminara's ability to accurately identify the suspect, and call into serious question the reliability of Seminara's photographic identification of Rhooms.

The reliability of Seminara's photographic identification is further undermined by the fact that Defendant Freed was the one who initiated and administered the photo array procedure. Before initiating the procedure, Detective Freed had conducted an unlawful interrogation of Trevor Perez and coerced him into signing a statement that Freed knew was false identifying Rhooms as the suspect.[4]  After coercing the false identification of Rhooms from Perez, Freed asked another detective to construct the photo array, but then Freed himself presented the array to Seminara, with no one else present.  It was in these circumstances that Seminara, based on a fleeting glimpse of the suspect in poor lighting, identified Rhooms.  Presented with this evidence, a reasonable jury could infer that Freed directed Seminara to Rhooms's photograph, either to pursue the same malicious ends that drove Freed to coerce a false statement from Perez in the first place, or as a further step to insulate himself from liability for procuring the false statement from Perez.

Second, the reliability of the Officer Defendants' lineup identifications of Rhooms are undermined by several circumstances.  As with Seminara, Henderson and Ortlieb had almost no opportunity to view the suspect's face before he fled down the alleyway on the night of the shooting.  Additionally, like Seminara, immediately after the incident, neither Henderson nor Ortlieb could provide any details about the suspect's appearance, other than that he was a black man wearing dark clothing.  As discussed, this fact in itself raises significant doubt as to the reliability of the officers' identification.  Even more glaringly problematic, however, is the

---

[4] Freed also broke with standard procedure and did not record his interrogation of Perez, which a reasonable jury could infer was a sign of a guilty conscience or an attempt to conceal what had happened during the interrogation.

suggestive nature of the lineups.  Before the lineups were administered, Detective Freed prepared a "wanted" poster that prominently displayed Rhooms's arrest photo and boldly stated that Rhooms "did exchange gunfire with uniformed members of the service," for which he was "WANTED FOR Attempted Murder of a POLICE OFFICER."  All of the Officer Defendants had access to the area where this poster was displayed, and Henderson definitely saw the poster before he made his lineup identification of Rhooms.  Presented with these facts, a reasonable jury could conclude that the lineup identifications were not sufficiently reliable to establish probable cause, and that Defendant Freed knew that there was reason to doubt the veracity of the witnesses and the reliability of their identifications.[5]  At a minimum, a reasonable jury could conclude that a reasonably cautious officer in the Individual Defendants' positions would have investigated Rhooms's proffered alibi before arresting him.  *See Wong v. Yoo*, 649 F. Supp. 2d 34, 60 (E.D.N.Y. 2009); *Lowth v. Town of Cheektowaga*, 82 F.3d 563, 571-72 (2d Cir. 1996).

## 2.  Personal Involvement

Defendants Seminara, Henderson, and Ortlieb also contend that they are entitled to summary judgment on Plaintiff's false arrest and imprisonment claim because they were not

---

[5] A reasonable jury could also infer that the circumstances of the shooting itself provided a motive for Defendants Henderson, Seminara, and Ortlieb to falsely identify Rhooms.  During their pursuit of the 222 Lenox Street suspect, the three officers fired a total of nineteen rounds at the suspect, as he fled, which ordinarily would violate police rules and subject the officers to possible discipline.  However, according to the Officer Defendants, they fired at the fleeing man because, as he was running away, he pulled out a black revolver and fired six rounds in their direction, some of which hit the alley walls around them.  Yet, the NYPD Crime Scene Unit recovered only nineteen shell casings and bullet fragments at the scene, all of which were consistent with the Officer Defendants' firearms.  Given these facts, a reasonable jury could infer that Defendants Henderson, Seminara, and Ortlieb were lying when they said the suspect had fired six shots at them, in order to justify shooting at a fleeing suspect, and further that the Officer Defendants deliberately made false identifications of Rhooms in order to corroborate the initial photo identification made by Seminara, thereby avoiding suspicious discrepancies in their account of the shooting incident.

personally involved in the decision to arrest him. (Defs.' Br. 9-10.) Defendants argue that, "aside from being the victim[s] of crime" and participating in lineup identification procedures, Henderson, Seminara, and Ortlieb had no involvement in Plaintiff's arrest and imprisonment. (Defs.' Br. 10.) The Court disagrees.

Having concluded that a reasonable jury could find Defendants' identifications of Rhooms insufficiently reliable to establish probable cause, *supra*, the Court has little trouble finding that a genuine issue of fact exists as to whether Seminara, Henderson, and Ortlieb were personally involved in Plaintiff's arrest and imprisonment. As trained law enforcement officers, Defendants Henderson, Seminara, and Ortlieb certainly knew that their identifications of Rhooms as the shooter would lead to his arrest and imprisonment, especially when, as they all knew, Rhooms was being sought for "Attempted Murder of a POLICE OFFICER." (Pl. 56.1, Ex. 27.) While, ordinarily, a police officer who merely witnesses, or is a "victim" of, a crime, but is not directly involved in arresting the suspect, is not deemed to be personally involved for purposes of a false arrest claim,[6] here, a reasonable jury could conclude that the Officer Defendants knowingly made false identifications of Rhooms, at Detective Freed's suggestion or direction, in order to ensure that Rhooms was arrested and prosecuted for the shooting. Under these circumstances, the Officer Defendants could be found to have been personally involved in the alleged false arrest and imprisonment of Rhooms. *See Provost*, 262 F.3d at 155 ("personal involvement" defined as "personal participation by one who has knowledge of the facts that rendered the conduct illegal," or indirect participation, such as "ordering or helping others to do the unlawful acts").

---

[6] *See, e.g.*, *Narvaez v. City of N.Y.*, 922 N.Y.S. 2d 12, 13 (App. Div. 2011) (affirming summary judgment dismissing claims of false arrest and malicious prosecution where "the [defendant] and [its] employees did not participate in the arrest or prosecution of plaintiff except as witnesses").

For these reasons, the Court denies the individual Defendants' motion for summary judgment on Plaintiff's claim of false arrest and imprisonment.

**B. Malicious Prosecution (42 U.S.C. § 1983)**

To prevail on a claim of malicious prosecution, a plaintiff must prove that "(1) the defendant either commenced or continued a criminal proceeding against him; (2) that the proceeding terminated in his favor; (3) that there was no probable cause for the criminal proceeding; and (4) that the criminal proceeding was instituted with actual malice." *Posr v. Doherty*, 944 F.2d 91, 100 (2d Cir. 1991).

Defendants move for summary judgment on Rhooms's claim of malicious prosecution, arguing that (i) Rhooms has failed to adduce evidence that any Defendant commenced or continued a criminal proceeding against him, (ii) Rhooms has failed to establish that Defendants commenced or continued any such criminal proceeding with "actual malice," and (iii) in any event, Rhooms's claim for malicious prosecution fails because there was probable cause to prosecute him. The Court disagrees on all three counts.

As to the first element that Defendants challenge—initiation of a criminal prosecution—Defendants argue that the decision to prosecute Rhooms was an independent decision by the Kings County District Attorney's Office, with no significant role played by Defendants in bringing about that decision. (Defs.' Br. 11-12.) Defendants plainly ignore, however, the well-established principle that where a police officer provides false or misleading information that influences a decision whether to prosecute, "he may be held liable for malicious prosecution." *Chimurenga v. City of N.Y.*, 45 F. Supp. 2d 337, 343 (S.D.N.Y. 1999); *accord Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 130 (2d Cir. 1997). Here, it is undisputed that all four Individual Defendants provided information to the District Attorney's Office that influenced its decision to prosecute

Rhooms.  (Pl. 56.1 ¶¶ 96-100.)  Among other things, Defendant Freed told the ADA that Rhooms had been identified by a confidential informant,[7] which was false.  (Pl. 56.1 ¶ 101.)  Defendants Seminara, Ortlieb, and Henderson informed the ADA that they had made a positive identification of Rhooms, which, as discussed *supra*, the jury could infer were knowingly false identifications. (Pl. 56.1 ¶¶ 92, 96-100.)

As to the second element—actual "malice"—Defendants argue that Rhooms has failed to show malice because he has adduced "no evidence that Freed played any significant role in the *initiation* and continuation of the prosecution of plaintiff's criminal case, other than investigating plaintiff's alibi."  (Defs.' Br. 12 (emphasis added).)  Aside from directly contradicting the record, which provides an adequate  basis for a jury to find that Defendants all played a significant role in the District Attorney Office's decision to prosecute, this argument also fails because "[a] lack of probable cause"—which a reasonable jury could find here, *see supra*—"generally creates an inference of malice." *Rentas v. Ruffin*, 816 F.3d 214, 221-22 (2d Cir. 2016) (quoting *Boyd v. City of N.Y.*, 336 F.3d 72, 78 (2d Cir. 2003)).   To the extent Defendants are arguing that Plaintiff must show that the Individual Defendants played a role in *both* initiating *and* continuing the prosecution to establish a malicious prosecution claim, they have not provided, nor has the Court identified, any authority to support that contention.

As to the fourth element—lack of probable cause—Defendants largely incorporate by reference their arguments about probable cause with respect to Rhooms's false arrest claim. (Defs.' Br. 13.)  Defendants further argue, however, that, for a claim of malicious prosecution, "indictment by a grand jury creates a presumption of probable cause that may *only* be rebutted by

---

[7] This purported confidential informant was Perez, whom Freed coerced into falsely identifying Rhooms as the shooter.

evidence that the indictment was procured by fraud, perjury, the suppression of evidence or other police conduct undertaken in bad faith." (Defs.' Br. 14 (quoting *Savino v. City of N.Y.*, 331 F.3d 63, 72 (2d Cir. 2003)).) Defendants are correct on this principle of law, but they fail to address the record evidence suggesting that, in this case, the Individual Defendants provided false and incomplete information to the ADA, and, in the case of Freed in particular, applied coercive interrogation techniques to procure a false identification of Rhooms at the outset of the investigation. *Supra*. This evidence of bad faith is more than sufficient to rebut the presumption of probable cause created by the criminal indictment.[8]

For these reasons, the Court denies Defendants' motion for summary judgment on Rhooms's claim of malicious prosecution.

### C. Denial of a Fair Trial (42 U.S.C. § 1983)

"A plaintiff establishes a denial of the right to fair trial claim by showing that the defendant fabricated evidence that was likely to influence a jury, forwarded that information to prosecutors,

---

[8] Defendants also argue that Rhooms's claim of malicious prosecution fails to the extent it relies on the Individual Defendants' testimony to the grand jury that returned the indictment as to Rhooms. (Defs.' Br. 15-16.) While Defendants are correct that the Supreme Court, in *Rehberg v. Paulk*, 566 U.S. 356 (2012), held that police officers are entitled to absolute immunity with respect to their confidential statements to a grand jury, Rhooms's claim of malicious prosecution survives summary judgment for the reasons stated above, irrespective of what testimony Defendants gave before the grand jury. *See Coggins v. Buonora*, 776 F.3d 108, 113 (2d Cir. 2015) (affirming denial of absolute immunity to police officer, where plaintiff's Section 1983 claims were based on alleged misconduct "prior to and independent of [officer's] perjurious grand jury appearance", and finding "fact that [officer's] grand jury testimony paralleled information he gave in other contexts does not mean that [plaintiff's] malicious prosecution claim was 'based on' [the officer's] grand jury testimony").

and that the plaintiff suffered a deprivation of liberty as a result." *Garnett v. City of N.Y.*, 13 Civ. 7083, 2014 WL 3950904, at *12 (S.D.N.Y. Aug. 13, 2014).

Defendants argue that Rhooms's claim of denial of the right to fair trial must fail because the statements made by Detective Freed and Officers Henderson, Seminara, and Ortlieb to the ADA were "testimonial" and thus cannot serve as the basis for such a claim. (Defs.' Br. 17 ("Even if the statements . . . were untrue," they do not support Rhooms's claim because they were "testimonial.").) In support of this argument, Defendants rely primarily on the Supreme Court's decision in *Rehberg v. Paulk*, 566 U.S. 356 (2012), in which the Court held that defendants are entitled to absolute immunity from civil lawsuits for their confidential testimony before a grand jury. However, neither *Rehberg* nor any of the other cases cited in Defendants' brief, all of which address testimonial statements made in the context of trial or in grand jury proceedings, supports Defendants' assertion that statements by a police officer to a prosecutor, made outside a courtroom and not to the grand jury, qualify as "testimonial" statements and are entitled to absolute immunity with respect to a Section 1983 fair trial claim. Indeed, a rule to that effect would run directly contrary to the vast body of case law establishing that making false statements to a prosecutor is the very essence of a claim for denial of the right to a fair trial. *See, e.g.*, *Soomro v. City of N.Y.*, 174 F. Supp. 3d 806, 815-16 (S.D.N.Y. 2016); *Ricciuti*, 124 F.3d at 130; *Coggins*, 776 F.3d at 113.

For these reasons, the Court denies Defendants' motion for summary judgment on Rhooms's claim for denial of the right to fair trial.[9]

---

[9] As a secondary argument, Defendants assert that Plaintiff's claim for denial of the right to fair trial cannot proceed to trial on the theory that Defendants are liable for the ADA's failure to turn over exculpatory evidence pursuant to its obligations under *Brady v. Maryland*, 373 U.S. 83 (1963). In his opposition brief, Rhooms does not address this argument, and the court construes that silence as a waiver of any claim based on supposed *Brady* violations during the pendency of the indictment against Rhooms. Moreover, the Court holds that any such *Brady* claim fails as a matter of law, because *Brady* requires only that a prosecutor turn over *Brady* materials "[at] the

### D.  Failure to Intervene (42 U.S.C. § 1983)

"[L]aw enforcement officials have an affirmative duty to intervene to protect against the infringement of constitutional rights from conduct committed by other officers in their presence." *Curley v. Village of Suffern*, 268 F.3d 65, 72 (2d Cir. 2001).  Defendants argue that summary judgment is appropriate on Plaintiff's claim for failure to intervene because (i) Plaintiff has failed to establish a violation of his constitutional rights, and (ii) even if Plaintiff has established a violation of his constitutional rights, he has failed to articulate a coherent claim for failure to intervene.  In his opposition brief, Plaintiff states that he "withdraws his failure to intervene claim insofar as questions of fact exist as to the *direct* involvement of each of the defendant officers in violating plaintiff's rights."  (Pl.'s Br. 21.)  Given the Court's ruling that questions of fact exist as to the Officer Defendants' direct involvement in violations of Rhooms's rights, *see supra*, the Court deems this claim withdrawn.

### E.  State Law Claims (Individual Defendants)

The Individual Defendants move for summary judgment on Rhooms's claims under New York law for false arrest, malicious prosecution, and battery, arguing that those claims both fail as a matter of law and should be dismissed for lack of subject matter jurisdiction.  The Court's analysis above largely disposes of Defendants' motion as to these claims.

As an initial matter, having denied Defendants' motion to dismiss Rhooms's federal claims, the Court exercises supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over Rhooms's analogous claims under New York law.

---

point in time at which the criminal defendant needs access to the evidence so that he or she may effectively use it at a proceeding that determines guilt," *Ambrose v. City of N.Y.*, 623 F. Supp. 2d 454, 469 (S.D.N.Y. 2009), and Plaintiff has made no showing that his prosecution had proceeded to such a stage before the indictment was dismissed.

### 1. False Arrest under New York Law

"A § 1983 claim for false arrest, resting on the Fourth Amendment right of an individual to be free from unreasonable seizures, including arrest without probable cause, is substantially the same as a claim for false arrest under New York law." *Weyant*, 101 F.3d at 852. Having denied Defendants' motion for summary judgment on Plaintiff's claim of false arrest under 42 U.S.C. § 1983, the Court likewise denies their motion as to Plaintiff's claim of false arrest under New York law.

### 2. Malicious Prosecution under New York Law

A claim for malicious prosecution under 42 U.S.C. § 1983 is substantially the same as a claim for malicious prosecution under New York law. *See Savino v. City of N.Y.*, 331 F.3d 63, 72 (2d Cir. 2003). Having denied the Individual Defendants' motion for summary judgment on Plaintiff's claim of malicious prosecution under 42 U.S.C. § 1983, the Court likewise denies their motion as to Plaintiff's analogous claim under New York law.

### 3. Battery

Under New York law, a battery is an "intentional wrongful physical contact with another person without consent." *Lederman v. Adams*, 45 F. Supp. 2d 259, 268 (S.D.N.Y. 1999) (quoting *Charkhy v. Altman*, 678 N.Y.S. 2d 40, 41 (App. Div. 1998)). In the context of a police arrest, if the arrest is determined to be unlawful, "any use of force against a plaintiff may constitute a battery, regardless of whether the force is considered reasonable as applied during a lawful arrest." *Micalizzi v. Ciamarra*, 206 F. Supp. 2d 564, 581-82 (S.D.N.Y. 2002) (citing cases). In light of the Court's holding that a genuine issue of material fact exists as to whether Plaintiff's

arrest was lawful, *supra*, the Court denies the Individual Defendants' motion for summary judgment on Plaintiff's claim of battery.

### F. Qualified Immunity

The Individual Defendants argue that the federal claims against them should be dismissed based on qualified immunity. (Defs.' Br. 21-22.) "Under federal law, a police officer is entitled to qualified immunity where (1) his conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known, or (2) it was 'objectively reasonable' for him to believe that his actions were lawful at the time of the challenged act." *Jenkins v. City of N.Y.*, 478 F.3d 76, 87 (2d Cir. 2007) (quotation omitted). Defendants do not dispute that Rhooms has clearly established rights to a fair trial and to be free from arrest and prosecution without probable cause. (Defs.' Br. 21-22.) Defendants argue instead that they are entitled to qualified immunity because there was "arguable probable cause" to arrest Rhooms. (Defs.' Br. 22.) The Court's probable cause analysis, *supra*, largely disposes of this issue. For the reasons stated in that section of this opinion, a reasonable jury could find that probable cause was lacking, and, for the same reasons, could find that it was unreasonable for the Individual Defendants to believe that probable cause existed. Accordingly, the Individual Defendants have not established their entitlement to qualified immunity as a matter of law.

Defendants likewise argue that Plaintiff's state law claims against them should be dismissed based on "governmental immunity," which is a qualified immunity that protects government actors in their exercise of discretion "of expert judgment in policy matters." (Defs.' Br. 23 (quoting *Cerbelli v. City of N.Y.*, 99 Civ. 6846, 2008 WL 4449634, at *21 (E.D.N.Y. Sept. 8, 2008) (citing *Mon v. City of N.Y.*, 574 N.Y.S. 2d 529 (N.Y. 1991))).) But qualified immunity does not apply to government officials who undertake unlawful action unreasonably or

in bad faith.  *See Bradley v. City of N.Y.*, 04 Civ. 8411, 2007 WL 232945, at *12 (S.D.N.Y. Jan. 26, 2007); *Rosen v. City of N.Y.*, 667 F. Supp. 2d 355, 363 (S.D.N.Y. 2009).  The question of governmental immunity thus overlaps in all material respects with the issue of federal qualified immunity, *supra*, and the Court accordingly rules that the Individual Defendants have not established their entitlement to governmental immunity as a matter of law.

### G.  *Respondeat Superior*

Under New York law, a municipality may be held vicariously liable for common law false arrest and malicious prosecution claims under a theory of *respondeat superior.  See Chimurenga v. City of N.Y.*, 45 F. Supp. 2d 337, 344 (S.D.N.Y. 1999) (citing *Claude H. v. Cnty. of Oneida*, 626 N.Y.S. 2d 933, 936 (App. Div. 1995), and *Johnson v. Town of Colonie*, 477 N.Y.S. 2d 513, 514 (App. Div. 1984)).  Defendants argue that the City of New York is entitled to summary judgment on Rhooms's *respondeat superior* claim because Rhooms has "failed to establish culpable conduct by [the Individual Defendants]."  (Defs.' Br. 23.)  Defendants offer no other basis on which to grant summary judgment on this claim.  (Defs.' Br. 23-24.)[10]  Having ruled that Plaintiff's state law claims against the Individual Defendants withstand summary judgment, the Court denies the City's motion for summary judgment on Rhooms's *respondeat superior* claim.

---

[10] For example, the City does not argue that the undisputed evidence shows that the Individual Defendants were acting outside the scope of their authority, notwithstanding the undisputed evidence of Detective Freed unlawfully coercing a false identification from Trevor Perez.  *See N.X. v. Cabrini Med. Ctr.*, 765 N.E. 2d 844, 847 (N.Y. 2002) (declining to apply *respondeat superior* liability where employee's misconduct was "not in furtherance of [the employer's] business and is a clear departure from the scope of employment").

## IV. <u>Conclusion</u>

For the foregoing reasons, the Court DENIES Defendants' motion in its entirety, except as to Plaintiff's failure to intervene claim, which he has withdrawn in response to the motion. The parties shall submit a proposed joint pretrial order no later than May 15, 2017.

SO ORDERED.

*/s/ Pamela K. Chen*
Pamela K. Chen
United States District Judge

Dated: March 31, 2017
      Brooklyn, New York